**COMPAGNIE de REASSURANCE d'ILE de FRANCE, et al. Plaintiffs,**

v.

**NEW ENGLAND REINSURANCE CORP., et al., Defendants.**

**Civil Action No. 87–27–NG.**

United States District Court,
D. Massachusetts.

Nov. 7, 1996.

William Shields, Mary Theresa Kaloupek, Day, Berry & Howard, Boston, MA, for Compagnie de Reassurance d'Ile de France, Eisen Und Stahl Ruckversicherungs AG, Folksam International Insurance Co. Ltd., Group Josi Reinsurance Co. S.A., Hannover Ruckversicherungs AG, Hanseatica Ruckversicherung AG, Imperio Reinsurance Co (UK) Ltd., Industrial Mutual Insurance Co., Manitoba Public Insurance Corp., Baltica–Nordisk Reinsurance, Co. A/S, Polaris A. AS, Sampo Mutual Insurance Co., Societa Assicuratrice Industriale SPA, Toronto General Insurance Co.

Kenneth W. Ritt, Day, Berry & Howard, Boston, MA, Debra A. deBastos, Katz, Fanger & Greeley, Boston, MA, for Universale Ruckversicherung AG.

Robert S. Frank, Jr., Bret A. Fausett, Cynthia T. MacLean, David A. Attisani, Choate, Hall & Stewart, Boston, MA, David S. Mortensen, Shafner, Gilleran & Mortensen, Boston, MA, for New England Reinsurance Corp., First State Insurance Co., Cameron & Colby Co., Inc.

## FINDINGS OF FACT AND RULINGS OF LAW REGARDING STATUTE OF LIMITATIONS DEFENSES

GERTNER, District Judge.

This action was brought by numerous European insurance retrocessionaires against a Massachusetts based retrocedent, a primary insurer and an underwriter to recover for fraud, breach of contract, and for violations of the Massachusetts Consumer Protection Act, M.G.L. ch. 93A, § 11 and the civil RICO statute, 18 U.S.C. § 1964(c). It was originally tried before another judge of this Court without a jury, and, after a 30–day trial, judgment was entered for the plaintiffs. On June 19, 1995, the First Circuit Court of Appeals vacated that judgment and certain of the judge's factual findings. The Court of Appeals remanded the case with instructions for this Court to make additional factual findings, and to reconsider certain conclusions of law in light of those additional findings. The Court of Appeals expressed the view that the record should not be reopened unless this Court found "exigent circumstances" requiring the taking of additional evidence.

On remand, the parties agreed that subsequent briefing would be conducted in stages. Accordingly, and pursuant to the Court's order dated October 5, 1995, the parties have submitted briefs addressing only the statute of limitation defenses which were raised by the defendants at trial but not, in the view of the Court of Appeals, adequately addressed by the original trial judge.

The facts of this case are extensively discussed in the Court of Appeals' decision, *Compagnie De Reassurance D'Ile de France v. New England Reinsurance Corp.*, 57 F.3d 56, 61–68 (1st Cir.) *cert. denied*, —— U.S. ——, 116 S.Ct. 564, 133 L.Ed.2d 490 (1995). The reader of this opinion is assumed to be familiar with those facts, and additional facts

will be referenced here only to the extent necessary to decide the issues at hand.

## I. *PROCEDURAL HISTORY*

The plaintiffs in this action are thirty-one reinsurance syndicates and reinsurance companies which, in the early 1980s, entered into a series of reinsurance treaties with defendant New England Reinsurance Company ("NERCO").[1] These treaties were known as the "System and Non–System Treaties" or "SANS Treaties." NERCO was in the business of reinsurance, whereby it would agree, in exchange for a premium, to share in risks which had been insured by other, "primary," insurance companies. Under the terms of the SANS treaties, defendant NERCO was permitted to "cede" to plaintiffs a percentage of the risk of certain of the insurance policies which had, in turn, been ceded to NERCO from primary insurers.[2]

After suffering greater than expected losses under the treaties, the plaintiffs brought this action which, after the complaint was amended on July 12, 1988, charged NERCO and certain of its affiliated companies with fraud, breach of contract, violation of M.G.L. ch. 93A, and violations of the RICO statute. The original trial judge found for plaintiffs on the contract, fraud and chapter 93A claims, and dismissed the RICO claims. On appeal, the Court of Appeals found that the Chapter 93A and RICO claims should have been dismissed, and remanded the fraud and contract claims for reconsideration by this Court.[3]

### A. *Fraud Counts*

With respect to the fraud counts, plaintiffs claimed that NERCO misrepresented, in two respects, the types of risks that were to be ceded to them under the SANS treaties. First, plaintiffs alleged that NERCO had misrepresented that the reinsurance policies which were to be ceded under the SANS treaties were to be "facultative" reinsurance, which plaintiffs understood to mean reinsurance of policies specifically selected and underwritten by the reinsurer. Plaintiffs considered facultative reinsurance to be less risky than its alternative, "treaty" reinsurance, under which a reinsurer agrees to reinsure a whole category of policies without the right to pick and choose specific policies.[4]

Plaintiffs also alleged fraud in NERCO's representation of how the ceded reinsurance policies were to be obtained. According to plaintiffs, NERCO misrepresented that it would obtain reinsurance business directly from primary insurers when in fact it obtained a significant portion of its business through the use of so-called Managing General Agents ("MGAs") and brokers. Plaintiffs allege that policies underwritten through MGAs and brokers are generally of a lower quality than those obtained directly from primary insurers because MGAs and brokers do not bear any of the risk of the policies they underwrite, and thus have less incentive to underwrite carefully.

Although the original trial judge found for the plaintiffs on both of their fraud theories, the Court of Appeals found that the trial judge's findings were clearly erroneous. With respect to the issue of whether the ceded reinsurance was facultative, the Court concluded that the type of reinsurance ceded by NERCO was facultative as the term was understood in the American reinsurance industry, and thus it was not fraud for NERCO to have represented it as such.

With respect to the plaintiffs' claims regarding the use of MGAs and brokers, the Court affirmed the trial judge's finding that NERCO misrepresented its intentions concerning the use of MGAs and brokers when it first solicited the retrocessionaires in 1979

---

1. There were originally thirty-four plaintiffs. However, three plaintiffs, Pohjola Insurance Company Ltd., Pohjola Insurance Company (UK), and De Centrale Herzverzekering N.V., have been dismissed from the case.

2. Thus, the plaintiffs were, in effect, reinsurers of a reinsurer.

3. The Court of Appeals left open the possibility that certain of the remaining common law claims could constitute violations of Chapter 93A.

4. There is no dispute that the relationship between plaintiffs and NERCO was a "treaty" relationship. The issue in dispute was about the relationship between NERCO and its primary insurers, and whether that relationship was of the "facultative" type.

through a document known as a "Placing Information." The Court vacated the original trial judge's finding of fraud, however, for three reasons: a) because he failed to consider whether certain facts, which subsequently became known to at least some of the plaintiffs, limited the fraudulent effects of NERCO's initial misrepresentation in subsequent treaty years; b) because he failed to consider the effect of the disclosure of those facts on the running of the statute of limitations; and c) because he failed to determine whether any of the plaintiffs actually relied upon NERCO's misrepresentations.

## B. Contract Claims

The plaintiffs also alleged that NERCO breached its contractual obligations under the SANS treaties. They claimed that because the reinsurance ceded to them was not facultative, NERCO had breached a contractual requirement that it cede only facultative reinsurance. The Court of Appeals rejected this claim for substantially the same reason as it rejected the fraud claim relating to the facultative character of the ceded policies.

The Court did, however, find potential merit in two other contractual claims. In the first claim, plaintiffs alleged that NERCO had breached its contractual representation that all of the ceded business would be underwritten by Graham Watson, an underwriter affiliated with NERCO's parent company.[5] The trial judge had found that NERCO breached this provision because, in his view, the supposedly facultative reinsurance which NERCO ceded was subject to the "automatic" or "semi-automatic" methods of underwriting. He concluded that these methods provided no meaningful opportunity for underwriting by Graham Watson and thus the ceded business was, effectively, not facultative at all. The Court of Appeals rejected this reasoning, finding that the "automatic" and "semi-automatic" methods of underwriting fit within the industry's definition of "facultative underwriting." It nonetheless expressed concern that Graham

Watson's underwriting may have been more nominal than real. It thus directed this Court to reexamine "evidence . . . of possible systematic inadequacies in the quality of the underwriting performed" and determine whether the underwriting was "so deficient as to be tantamount to a breach of the duty to underwrite."

Finally, the Court of Appeals sustained the trial judge's finding that NERCO had breached a contractual obligation (referred to as "Warranty No. 2") to "co-reinsure for 10 percent participation on all 'System Business' " ceded under the treaties.[6] It remanded the matter, however, for a determination of whether this claim is barred by "the statute of limitations or any other bar to recovery."

## II. STATUTE OF LIMITATIONS

The parties agree that the date from which to measure the relevant limitations periods is July 12, 1988, when plaintiffs amended their complaint to assert the claims now at issue. The Court of Appeals held that the claims were to be decided under Massachusetts law, which provides for a six year limitations period for breach of contract actions, and a three year limitations period for claims of fraud. *Compagnie*, 57 F.3d at 88. Moreover, actions under M.G.L. ch. 93A have a four year limitations period. *Cambridge Plating Co., Inc. v. Napco, Inc.*, 991 F.2d 21, 23, n. 1 (1st Cir.1993). Thus, defendants may avoid liability if they can show that plaintiffs' fraud claims accrued no later than July 12, 1985, that their contract claims accrued no later than July 12, 1982, or that their M.G.L. ch. 93A claims, if any, accrued no later than July 12, 1984.

Defendants argue that all of plaintiffs' fraud and Chapter 93A claims, and "virtually all" of their contract claims are barred by the statute of limitations. They point out that an action for fraud normally accrues when the plaintiff is injured by the fraud, and contend that plaintiffs' injuries, if any, occurred during the time the SANS treaties were in force

---

5. NERCO is a subsidiary of The Hartford Group which is, in turn, a subsidiary of ITT.

6. System Business referred to business obtained from primary insurance companies which were part of the Hartford Group, NERCO's parent company.

(i.e. no later than December, 1983 and in any event long before July 12, 1985).

Defendants further contend that an action for breach of contract normally accrues at the time of the breach. Defendants argue that, with respect to the Warranty No. 2 claim, this warranty was only found in the 1980 and 1981 treaties, and therefore any breach occurred prior to July 12, 1982. In addition, they contend that plaintiffs' contract claim based on NERCO's alleged failure to underwrite is limited to failures which occurred after July 12, 1982, and may be pressed only by those plaintiffs who had entered into treaties for the years 1982 and 1983 (i.e. treaties which were in force during the post-July 12, 1982 limitations period).

Plaintiffs respond that, with only one exception, their claims are timely because they benefit from two doctrines which require tolling of the limitations period under Massachusetts law. First, they contend that the statute of limitations should be tolled because the defendants fraudulently concealed from them the existence of their causes of action. *See Puritan Medical Center, Inc. v. Cashman,* 413 Mass. 167, 175, 596 N.E.2d 1004 (1992). In particular, they assert that NERCO had an affirmative fiduciary duty to disclose to them all material facts relevant to the ceded risks, and that NERCO's continuing failure to perform this duty tolled the limitations period.

In a related vein, plaintiffs also claim the benefit of the Massachusetts "discovery rule" which provides that a cause of action does not accrue until the injured party knew or, with the exercise of reasonable diligence, should have known, the factual basis for the cause of action. *Id.* at 175, 596 N.E.2d 1004. In essence, plaintiffs claim that they reasonably placed their trust in defendants to act in accordance with their obligations and, therefore, had no occasion, through the exercise of due diligence, to know of the defendants' misconduct.

## A. *The Nature of NERCO's Duty to Plaintiffs*

■ At the heart of plaintiffs' argument is their contention that the parties to a reinsurance treaty owe each other a duty of *uberrimae fidei,* or "utmost good faith," a duty which the plaintiffs equate to that of a fiduciary. They argue that because of the existence of this duty, NERCO was under an affirmative obligation to advise them of facts material to the risks being insured, and in particular to advise them of its failure to perform under the SANS treaties as it had represented it would.

Although defendants do not dispute the existence of this duty,[7] they insist that it is not equivalent to a fiduciary duty, and thus NERCO's failure to provide information to plaintiffs did not toll the limitations period. They further argue that whatever duty NERCO might have had did not relieve plaintiffs of their obligation to investigate potential claims once they were on notice that unexpected losses were occurring.

The doctrine of *uberrimae fidei* originally applied to all insurance contracts. *See* Deborah F. Cohen, et al., *Uberrimae Fidei and Reinsurance Rescission: Does a Gentlemen's Agreement Have a Place in Today's Commercial Market?,* 29 Tort & Ins.L.J. 602, 606–607 (1994). It was first articulated in the 18th century case of *Carter v. Boehm,* 97 Eng.Rep. 1162 (K.B.1766), and imported into American jurisprudence by the United States Supreme Court in *M'Lanahan v. Universal Ins. Co.,* 26 U.S. (1 Pet.) 170, 184, 7 L.Ed. 98 (1828). *See* Cohen, *supra,* at 606–607.

*Carter* and *M'Lanahan* were primary insurance cases, but the doctrine applied with equal force in early reinsurance cases as well. In *New York Bowery Fire Ins. Co. v. New York Fire Ins. Co.,* 17 Wend. 359 (N.Y.Sup. Ct.1837), the Court held that the reinsured must disclose every "fact and circumstance which can possibly influence the mind of any prudent and intelligent insurer, in determining whether he will underwrite the policy at all, or [at] what premium he will underwrite it." *New York Bowery,* 17 Wend. at 367

---

7. Indeed, the Court of Appeals specifically held that such a duty existed. *Compagnie,* 57 F.3d at 72–73.

(*quoted in* Cohen, *supra,* at 607). In *Sun Mutual Ins. Co. v. Ocean Ins. Co.,* 107 U.S. 485, 510, 1 S.Ct. 582, 599–600, 27 L.Ed. 337 (1883), the United States Supreme Court stated that:

> In respect to the duty of disclosing all material facts, the case of reinsurance does not differ from that of original insurance. The obligation in both cases is one of *uberrimae fidei.* The duty of communication, indeed, is independent of the intention, and is violated by the fact of concealment even where there is no design to deceive. The exaction of information in some instances may be greater in a case of reinsurance than as between the parties to an original insurance. In the former, the party seeking to shift the risk he has taken is bound to communicate his knowledge of the character of the original insured, where such information would be likely to influence the judgment of an underwriter; while in the latter, the party ... is not bound, nor could it be expected that he should speak evil of himself.

As the foregoing excerpt illustrates, the doctrine of *uberrimae fidei* was originally grounded in the supposition that in any insurance relationship, the insured is in a far better position than the insurer to be aware of the risks associated with a contract of insurance, and should therefore be obliged to reveal such risks to the insurer. However, while this assumption may have been accurate in the area of marine insurance (whence the doctrine of *uberrimae fidei* originated), where the insurer has no practical ability to inspect an insured vessel located in a foreign port or at sea, it does not necessarily hold true for other types of primary insurance, such as fire or life insurance. In the latter cases, it is feasible for the insurer to inspect the insured property or examine the insured individual before issuing a policy.

As the business of insurance expanded beyond its maritime origins, courts began to recognize that in the ordinary case, primary insurers did not need the protection that *uberrimae fidei* provided. *See Penn Mutual Life Ins. Co. v. Mechanics' Savings Bank & Trust Co.,* 72 F. 413, 434–435 (6th Cir.1896); *Stipcich v. Metropolitan Life Ins. Co.,* 277

U.S. 311, 316, 48 S.Ct. 512, 513, 72 L.Ed. 895 (1928) (noting that the "traditional rule" of *uberrimae fidei* had been relaxed for life insurance contracts). Thus, today, *uberrimae fidei* is understood as applying in the primary insurance field only to marine insurance. *See, e.g. Puritan Ins. Co. v. Eagle Steamship Co., S.A.,* 779 F.2d 866, 870 (2d Cir.1985).

The role of *uberrimae fidei* in the reinsurance context has evolved in a somewhat different manner. Historically, litigation involving reinsurance contracts was a rarity. Insurers and reinsurers operated under an informal code of conduct under which they were often prepared to compromise disputes rather than undermine a long standing relationship of trust. *See* Steven W. Thomas, *Utmost Good Faith in Reinsurance: A Tradition in Need of Adjustment,* 41 Duke.L.J. 1548, 1551–1552 (1992). Accordingly, there was relatively little judicial scrutiny of traditional reinsurance practices, and *uberrimae fidei* became as much a part of the culture of the insurance industry as a legal doctrine. *Id.*

Changes in the structure of the insurance market in the past few decades appear, however, to have brought the prior era of good feeling to an end. The profitability of insurance companies today has been undermined by huge environmental and asbestos related losses with the result being that insurers have been less willing to compromise claims which could push them towards insolvency. *Id.* at 1559–1560. Accordingly, reinsurance litigation has become more common, and in many such cases courts have been called upon to explicate the precise contours of the *uberrimae fidei* duty. *See, e.g., Security Mutual Casualty Co. v. Affiliated FM Ins. Co.,* 471 F.2d 238, 241 (8th Cir.1972); *Carlingford Australia General Ins. Ltd. v. St. Paul Fire & Marine Ins. Co.,* 722 F.Supp. 48 (S.D.N.Y.1989); *Sumitomo Marine & Fire Ins. Co. v. Cologne Reinsurance Co.,* 75 N.Y.2d 295, 552 N.Y.S.2d 891, 895, 552 N.E.2d 139, 143 (1990); *Christiania General Ins. Corp. of New York v. Great American Ins. Co.,* 979 F.2d 268, 278–281 (2d Cir.1992); *North River Ins. Co. v. CIGNA Reinsurance Co.,* 52 F.3d 1194, 1212–13 (3d Cir.1995);

*Unigard Security Ins. Co., Inc. v. North River Ins. Co.,* 4 F.3d 1049, 1054 (2d Cir. 1993).

The trend in these modern cases has been to recognize *uberrimae fidei* as the traditional operative standard, but to interpret it so as to require rescission of reinsurance contracts only where the reinsured acted in bad faith or where the reinsurers suffered prejudice from a failure to disclose. For example, in *Christiania,* the court held that a reinsured owes the reinsurer "utmost good faith, requiring the reinsured to disclose to the reinsurer all facts that materially affect the risk of which it is aware and of which the reinsurer itself has no reason to be aware." 979 F.2d at 278. The court went on to hold, however, that the duty to disclose was not triggered when the reinsured had no reason to know that a fact was material to the reinsurer, even when that later turned out to be the case. *Id.* at 279.

In *Unigard,* the Second Circuit considered whether a primary insurer was required to give notice to its reinsurer that it had entered in the "Wellington Agreement," an administrative mechanism for evaluating and settling asbestos related claims. The Court held as follows:

> The good faith and fair dealing implied in all contracts also required notice. In reinsurance, we have characterized this duty in dicta as one of 'utmost good faith.' ... This view certainly finds support in the caselaw and the literature, although, as noted, some have argued that utmost good faith does not accurately describe the modern relationship of sophisticated insurers bargaining at arms length.... Nevertheless, because information regarding risks lies with the ceding insurer, the reinsurance market depends upon a high level of good faith to ensure prompt and full disclosure. Absent such disclosure, reinsurers would have to duplicate actuarial and claims-handling efforts of ceding insurers, and reinsurance would become unavailable. Courts should thus adopt information forcing rules based on the good faith the reinsurance market demands.

*Unigard,* 4 F.3d at 1066. The Court concluded, however, that even though there was a failure of notice, it would not rescind the contract because there was no prejudice to the plaintiff or bad faith on the part of the defendant. *Id.* at 1068–70. Although the Wellington Agreement limited the rights of the primary insurer against its insureds, the Court concluded that entering into the agreement was akin to a good faith settlement of a claim, about which the defendants had no obligation to notify the plaintiffs. *Id.* In *CIGNA,* 52 F.3d at 1212, the Third Circuit adopted the *Unigard* "prejudice or bad faith" standard to obtain a similar result.

Most recently, the First Circuit in this case affirmed that "NERCO, having obtained by treaty the power to impose significant risks and liabilities upon plaintiff retrocessionaires, owed to them the utmost good faith in its dealings under the treaties." *Compagnie,* 57 F.3d at 72. Like the other circuit courts to consider the issue, the First Circuit found that this duty required NERCO "to exercise good faith and to disclose all material facts." *Id.* at 73.

In sum, while some commentators have questioned the continued vitality of *uberrimae fidei,* (*see* Thomas, *supra;* Cohen, *supra*), recent caselaw, including the First Circuit's decision in this case, confirms its applicability to the reinsurance treaties at issue here. For this reason, I find that NERCO owed to its retrocessionaires a duty to exercise good faith and to disclose all material facts. *Compagnie,* 57 F.3d at 72–73; *CIGNA,* 52 F.3d at 1212; *Christiania,* 979 F.2d at 279; *Unigard,* 4 F.3d at 1066. In particular, NERCO owed plaintiffs a duty to disclose any practices on its part which, in the exercise of utmost good faith, it believed were material to the risks being ceded, and which were inconsistent with its own prior representations or with its contractual obligations.

### B. *Fraudulent Concealment*

The preceding discussion is all by way of background to the issue at hand: whether NERCO's alleged breach of its duty of *uberrimae fidei* tolled the statute of limitations. M.G.L. ch. 260 § 12 provides that if a potential defendant "fraudulently conceals" a cause of action from the knowledge of the person

entitled to bring it, the limitations period is tolled until the cause of action is discovered. Massachusetts courts have interpreted this provision to apply to cases where the defendant takes affirmative steps to conceal the existence of the operative facts underlying the cause of action or where the defendant "breached a fiduciary duty of full disclosure." *Puritan Medical Center, Inc. v. Cashman,* 413 Mass. 167, 175, 596 N.E.2d 1004 (1992). *See also Frank Cooke, Inc. v. Hurwitz,* 10 Mass.App.Ct. 99, 106, 406 N.E.2d 678 (1980); *Stetson v. French,* 321 Mass. 195, 198, 72 N.E.2d 410 (1947).

 Mere negligent failure to disclose material facts does not constitute fraudulent concealment. *Compagnie,* 57 F.3d at 73. Neither is it fraudulent concealment when the defendant, in good faith, does not disclose because it does not believe that a cause of action exists. *Fowles v. Lingos,* 30 Mass. App.Ct. 435, 440–41, 569 N.E.2d 416 (1991). Thus, to invoke successfully fraudulent concealment tolling in this case, plaintiffs have the burden [8] of showing that NERCO had a fiduciary duty to disclose the operative facts underlying their causes of action, that NERCO intentionally failed to do so, and that plaintiffs failed to discover these facts as a result.[9] *Puritan Medical Center,* 413 Mass. at 175–177, 596 N.E.2d 1004.

### 1. *NERCO's Fiduciary Duty*

 Since plaintiffs have not pressed any allegation here of active concealment by defendants, they must show that NERCO's duty of disclosure was a fiduciary one for the purposes of the fraudulent concealment doctrine. I conclude that it was.

 Fundamentally, a fiduciary is a person "having duties involving good faith, trust, special confidence, and candor towards another." Black's Law Dictionary 625 (6th Ed.1990). Under Massachusetts law, a fiduciary owes its beneficiary the highest degree of good faith, loyalty and fair dealing. *Starr v. Fordham,* 420 Mass. 178, 183, 648 N.E.2d 1261 (1995); *Cardullo v. Landau,* 329 Mass. 5, 8, 105 N.E.2d 843 (1952). A fiduciary relationship "occurs when one party reposes, to the other's knowledge, trust and confidence under circumstances in which the other's failure to make disclosure would be inequitable." *Burns v. Massachusetts Inst. of Tech.,* 394 F.2d 416, 419 (1st Cir.1968).

 "The question of whether, in a particular factual setting, a fiduciary relationship exists is a question of fact." *Industrial General Corp. v. Sequoia Pacific Systems Corp.,* 44 F.3d 40, 44 (1st Cir.1995). A fiduciary relationship is not created merely because a plaintiff has reposed trust and confidence in a defendant. *Id.* Rather, the "catalyst" which transforms an ordinary business relationship into a fiduciary one is "defendant's knowledge of the plaintiff's reliance upon him." *Broomfield v. Kosow,* 349 Mass. 749, 755, 212 N.E.2d 556 (1965).[10]

Although the reinsurance cases generally refer to a duty of "utmost good faith" or *uberrimae fidei,* rather than to a fiduciary duty,[11] it is hard to see any principled dis-

---

8. *See Friedman v. Jablonski,* 371 Mass. 482, 487, 358 N.E.2d 994 (1976).

9. Contrary to defendants' assertion, plaintiffs need not prove that they exercised due diligence in investigating the existence of the causes of action. No such duty exists where fraudulent concealment arises out of a failure of a duty of disclosure on the part of the defendants. *Puritan Medical Center,* 413 Mass. at 177, n. 9, 596 N.E.2d 1004. Once fraudulent concealment is established, the limitations period is tolled until plaintiffs actually become aware of the operative facts. Mere suspicion of fraud is insufficient to end the tolling period. *Tracerlab, Inc. v. Industrial Nucleonics Corp.,* 313 F.2d 97, 102 (1st Cir.1963).

10. Defendants argue that the Court of Appeals' opinion in *Industrial General, supra,* established

a "test" for determining whether a fiduciary relationship exists. To the contrary, the *Industrial General* opinion merely summarizes the indicia which are "generally present" and "frequently ... found" in fiduciary relationships, without purporting to be exhaustive. 44 F.3d at 44.

In *Industrial General,* the court held that a fiduciary relationship did not exist between two corporations where one corporation "unilaterally" reposed trust and confidence in the other. *Id.* at 45. By contrast, the special duties attendant to a reinsurance relationship were, or should have been, known to both sides in this action.

11. *But see German–American Ins. Co. v. Commercial Fire Ins. Co.,* 95 Ala. 469, 11 So. 117, 120 (1892) (the relations between reinsurer and reinsured under a reinsurance treaty "were of a fiduciary character" and the reinsured was "the

tinction between the two standards for the purposes of fraudulent concealment analysis. Like a fiduciary, a reinsured has an affirmative obligation to notify the reinsurer of material facts. Accordingly, just as it is reasonable for one to trust a fiduciary, and to rely on a fiduciary's representations without further inquiry, it is reasonable for a reinsurer to rely on the representations of a reinsured, who has a duty to reveal all material facts. Cf. *Continental Cas. Co. v. Stronghold Ins. Co., Ltd.,* 77 F.3d 16, 21–22 (2d Cir.1996) (noting that "[a]lthough it has been said that the relationship between a reinsured and its reinsurer is not technically a fiduciary one ... centuries of history have treated both as allies rather than adversaries" and also that "[d]efences based on available periods of limitation usually have not been taken by insurers in the London market, and some participants in the market feel that it is a custom not to assert them.").

Both *uberrimae fidei* and the fiduciary duty arise out of a relationship of vulnerability. In the case of a fiduciary, this relationship may sometimes result from an inherent vulnerability, as in the case of a layman who trusts a doctor, *see Fowles v. Lingos,* 30 Mass.App.Ct. 435, 441, 569 N.E.2d 416 (1991), but more often it arises out of a purely conventional understanding that one party is permitted, as a matter of law, to trust the other in the managing of certain affairs. A bankruptcy trustee, for example, may be no more sophisticated than the creditors of the bankrupt estate. Nor may a corporate director be more sophisticated than his shareholder. In these situations,

the law recognizes that vigilant monitoring of the fiduciary by a beneficiary would be impractical and would undermine the benefit that the relationship is intended to create.

Similarly, the relationship between reinsured and reinsurer under a reinsurance treaty is one of profound vulnerability.[12] By entering into a proportional reinsurance treaty, a reinsurer essentially becomes the "silent partner" of the reinsured.[13] Every risk that the reinsured chooses to cede under a treaty automatically imposes a risk on the reinsurer. All discretion lies with the reinsured and the reinsurer must "follow the fortunes" of the reinsured by indemnifying it for all payments made to its insureds in good faith. *See CIGNA,* 52 F.3d at 1199. The reinsurer relies on the "utmost good faith" of the reinsured and the reinsured is aware of this. *See Broomfield,* 349 Mass. at 755, 212 N.E.2d 556 (stressing the importance of defendant's knowledge of plaintiff's reliance in finding the existence of a fiduciary duty).

Defendants cite to various cases in which courts have refused to describe a reinsurance relationship as fiduciary. *See Christiania,* 979 F.2d at 278; *CIGNA,* 52 F.3d at 1212–1213; *North River Ins. Co. v. Philadelphia Reinsurance Corp.,* 797 F.Supp. 363, 370 (D.N.J.1992); *International Surplus Lines Ins. Co. v. Fireman's Fund Ins. Co.,* 1989 WL 165045 (N.D.Ill.1989); *International Ins. Co. v. Certain Underwriters at Lloyd's London,* 1991 WL 349907 (N.D.Ill.1991). However, with only one exception (discussed *infra*), all of these cases involved facultative reinsurance. The facultative reinsurance relationship does not entail the same degree of

agent" of the reinsurer "for the purposes of reinsuring itself in the latter."); *Mutuelle Generale Francaise Vie v. Life Assurance Co. of Pennsylvania,* 688 F.Supp. 386, 397–98 (N.D.Ill.1988) (concluding on facts of complaint that reinsurer owed fiduciary duty to reinsured in the carrying out of its duties under a reinsurance treaty).

**12.** It is irrelevant that, as the Court of Appeals concluded, "[t]he parties here were of equal power and highly knowledgeable." *Compagnie,* 57 F.3d at 80. The Court was addressing the relationship of the parties with respect to their negotiation of the terms of the reinsurance treaties, and concluded that NERCO had no duty to "volunteer a plethora of details on their proposed underwriting practices." *Id.*

Thus, while the Court of Appeals makes it clear that NERCO did not have a fiduciary duty to explain every element of its reinsurance practice to the sophisticated insurers who were its retrocessionaires, I do not understand the Court of Appeals to have foreclosed the possibility that NERCO owed plaintiffs a fiduciary duty with respect to its administration of the SANS treaties, and in particular a duty to disclose any material deviation from the representations it made in its solicitation of treaty participants. Surely if *uberrimae fidei* imposed any duty on NERCO, it was a duty to disclose such material deviations.

**13.** The original trial judge likened the relationship to a "marriage."

vulnerability as does a treaty relationship, since, unlike the treaty reinsurer, the facultative reinsurer has the ability to "pick and choose" the risks it will take, and may, like an ordinary insurer, investigate those risks in advance. *See North River,* 797 F.Supp. at 370 (finding a lesser duty where reinsurance is "facultative" rather than "treaty").

The one treaty reinsurance case lending support to defendants' position is unpersuasive. In *International Ins. Co.,* an insurance company brought suit against its reinsurers, seeking reimbursement for payments made in settlements of claims under its primary insurance policies. The reinsurers counterclaimed on various theories, including fraud. The reinsurer's fraud theory was premised on a claim that the insurance company knew, but failed to disclose, certain facts material to the insured risks. A magistrate judge found that under Illinois law, the insurance company owed no duty to the reinsurers to disclose the material facts, even if it knew that the reinsurers were laboring under a misapprehension about them. *International Ins. Co.,* 1991 WL 349907 at p. *19. Although the court recognized that other courts had found a duty of "highest faith" in reinsurance contracts, the court found that such a duty arises only from specific contractual language to that effect, language which was absent from the contract at issue. *Id.*

The ruling in *International Ins. Co.* is unpersuasive because it is based on the mistaken premise that, absent a specific contractual provision, there are no special duties arising out of a reinsurance relationship. This premise is directly contradicted by all of the subsequent appellate cases which have considered the issue, as well as by the First Circuit in this case. Those courts have all

reaffirmed that *uberrimae fidei* is the governing principle in such situations.

The better view is stated in *Mutuelle Generale Francaise Vie v. Life Assurance Co. of Pennsylvania,* 688 F.Supp. 386, 397–98 (N.D.Ill.1988). In *Mutuelle Generale,* the parties had entered into a reinsurance treaty similar to the ones at issue here. The plaintiff reinsurer claimed, among other things, that the defendant had breached a fiduciary duty. The Court refused to dismiss the claim, concluding that, at least with respect to the administration of the treaties, the defendant was a fiduciary.[14] The court reasoned that:

> effectively [defendant] was [plaintiff's] agent in providing information on the ceded policies, forwarding the premiums and investigating and paying claims.... [Defendant] alone had contact with the policies and policy holders for [plaintiff's] account. Under the Treaty [plaintiff] was entitled to place its 'highest faith' in [defendant].... In that sense and to that extent, [plaintiff] placed its confidence in [defendant's] fair administration of its Treaty responsibilities, and [defendant] was in a dominant and influential position in carrying out its reporting and administration obligations.

*Mutuelle Generale,* 688 F.Supp. at 398.[15]

The reasoning of *Mutuelle Generale* applies in this case. Under the SANS treaties, the plaintiffs were flying blind. Although all of the parties are sophisticated players in the insurance market, NERCO was, by the nature of the relationship created by the SANS treaties, in the dominant position. Only NERCO had direct contact with the underlying risks and only NERCO was in a position to effectively monitor its own compliance with the treaty terms.

---

**14.** Defendants point out that in *Mutuelle Generale* the court merely refused to dismiss the complaint, rather than "finding" the existence of a fiduciary duty. This is true, but beside the point. The court concluded that the facts stated in the complaint, namely that the plaintiff and defendant were parties to a reinsurance treaty, were sufficient to state a claim for breach of fiduciary duty. *Mutuelle Generale,* 688 F.Supp. at 397–398. Similarly, I conclude that the existence of a treaty reinsurance relationship between the parties here is a sufficient basis to conclude that NERCO owed a fiduciary duty to plaintiffs.

**15.** Unlike the treaties at issue here, the treaty in *Mutuelle Generale* required the defendant to cede all of the life and disability business written by a particular insurance agency. The court concluded that this particular duty was "ministerial" and thus did not fall under defendant's fiduciary duty. 688 F.Supp. at 399. By contrast, the SANS treaties gave NERCO considerable discretion in determining the source of business that it would cede to plaintiffs.

In sum, plaintiffs placed in NERCO the utmost good faith to cede only those risks which were consistent with the treaty terms and NERCO's representations, and reasonably expected that NERCO would, in "utmost good faith," seek to comply with those terms, and notify plaintiffs of any deviations. NERCO was or should have been aware of the this, as the duty of utmost good faith was implied in the SANS treaties as a matter of law. *Compagnie*, 57 F.3d at 72–73. Accordingly I find that NERCO owed a fiduciary duty to plaintiffs to disclose material facts under the SANS treaties.

## 2. NERCO's Intentional Breach of the Duty to Disclose

Having found that NERCO owed plaintiffs a duty of disclosure, I must now determine whether NERCO's failure to disclose was intentional, so as to constitute fraudulent concealment within the meaning of M.G.L. ch. 260 § 12. *Compagnie*, 57 F.3d at 73.[16]

### a. Fraud Claims

With respect to plaintiffs' fraud claims, I find that, as a matter of law, NERCO had a duty to disclose to plaintiffs any fraud which it had committed against them. Obviously, the existence of fraud is a "material fact" subject to the duty of *uberrimae fidei*. Moreover, to the extent that NERCO committed fraud against plaintiffs, it was, by definition, intentional. It follows that any subsequent failure to disclose the existence of such fraud must have been intentional as well.

### b. Contract Claims

With respect to the Warranty No. 2 claims, although the Court of Appeals sustained the trial judge's finding that NERCO breached Warranty No. 2, NERCO contends that plaintiffs have failed to prove that its failure to disclose the breach was intentional, and thus failed to prove a necessary element of fraudulent concealment. In particular, NERCO contends that the warranty language was ambiguous and that there was a good faith disagreement between the parties as to its meaning. While plaintiffs' interpretation was ultimately accepted by the original trial judge, *see Compagnie de Reassurance D'Ile de France v. New England Reinsurance Corp.*, 825 F.Supp. 370, 382 n. 6 (D.Mass.1993) *aff'd in part and rev'd in part on other grounds*, 57 F.3d 56 (1st Cir.1995), NERCO contends that there is no evidence that its breach was intentional when it occurred, and therefore no evidence that it intentionally concealed the breach from plaintiffs.

The facts are as follows: As originally conceived by NERCO, the SANS treaties were to be surplus share treaties with a $250,000 per risk retention. In other words, NERCO would retain the first $250,000 of exposure on each risk it assumed, and was entitled to cede to the plaintiffs the remainder of each risk. An additional provision, however, greatly diminished the significance of the $250,000 retention clause, because it allowed NERCO to reinsure even that amount by means other than the SANS treaties. The provision permitted NERCO to reinsure its net retention through either quota share or excess of loss reinsurance.[17] This

16. Defendants contend that this court's finding of a fiduciary duty on NERCO's part is inconsistent with the Court of Appeals' ruling that "simple negligence in not disclosing a material fact" does not constitute fraudulent concealment. They point out that even a negligent failure of a fiduciary is actionable under Massachusetts law, and suggest that one cannot be both a fiduciary and immune from a fraudulent concealment claim based on simple negligence. Since the Court of Appeals found that negligence does not constitute fraudulent concealment, they conclude that they cannot logically be fiduciaries.

Defendants conflate two distinct inquiries. Not every breach of fiduciary duty constitutes fraudulent concealment. While it is true that "a claim of fraud [or fraudulent concealment] may

not be founded on innocent misrepresentation," *Compagnie*, 57 F.3d at 73, this holding is entirely consistent with the view that some negligent behavior may still breach the duty of fiduciary, and thus be actionable under Massachusetts law. Put another way, one may negligently breach one's fiduciary duty without engaging in fraudulent concealment if the requisite intent is absent.

17. Under quota share reinsurance, the reinsurer takes a fixed percentage of the risk on each covered policy. Under excess of loss reinsurance, the reinsurer is only liable under the policy if certain conditions (such as claims above a certain amount or the occurrence of a catastrophe) are met.

provision permitted NERCO to, in the words of its own expert, "net down its retention . . . without limit." The expert also conceded that he had never come across such a provision before.

In the negotiations which followed NERCO's issuance of its draft treaty language, plaintiffs' lead underwriters expressed concern about the lack of a meaningful net retention requirement in the proposed treaty language. The treaty language was negotiated through the use of two intermediaries: G.L. Hodson & Son, Inc. ("Hodson") in the United States, and E.W. Payne ("Payne") in London. In July of 1979, Payne transmitted a telex to Hodson indicating that Dick Hazell, the original lead underwriter for the SANS treaties at Lloyd's of London, expressed "concern" that "NERCO would probably have no retention" under the proposed treaty language. Similarly, in November of 1979, Payne reported to Hodson that Ralph Bailey, the lead underwriter for the London companies, had objected that "NERCO's lack of retention respect System business spoils concept when weighed with deductions being requested."

Ralph Bailey testified at trial that he would not have participated in the SANS treaties unless "there was proper retention," one "which is not subject to some further reinsurance by the cedent." Bailey's testimony is corroborated by John Garner and Nigel Huntington–Whitely, who handled the negotiations for Payne. Garner testified that Bailey told him that he wanted to "ensure that NERCO was in a true sense at risk in these treaties," while Huntington–Whitely testified that Bailey was "concerned" about the lack of net retention. Thomas Hearn, Garner and Huntington–Whitely's counterpart at Hodson, the United States intermediary, also confirmed that Bailey was concerned about NERCO's lack of retention.

In response to Hazell and Bailey's objections, NERCO changed its position in December of 1979. A telex from Payne to Hodson, dated December 13, 1979, states: "Following your view that NERCO retain same as Terra Nova lead line Bailey now indicates 10 percent acceptance subject 10 percent co-reinsurance by NERCO on system business." Included in this telex was a revised draft of the "slip" which was used to solicit treaty participation.

The revised slip differed from NERCO's earlier draft in two respects relevant here.[18] It included, for the first time, Warranty No. 2, the warranty at issue here. That warranty provided, "Reassured co-reinsure for 10pct participation on all 'system business' ceded hereon." In addition, while the original draft included language permitting NERCO to "disregard quota share and excess of loss reinsurances" for the purposes of determining its net retention, this language was modified in the new draft to apply only to reinsurance of "system business." As to non-system business, NERCO was permitted to reinsure only with excess of loss reinsurance.

The above quoted language apparently satisfied all parties, and was made part of the offering slip circulated to potential treaty participants. NERCO now argues that the slip language[19] is ambiguous, since even with the addition of Warranty No. 2, it still plausibly permits NERCO to disregard quota share and excess of loss reinsurance in determining its net retention.

After reviewing the evidence, I find that NERCO must have known that Warranty No. 2 required it to retain a 10% unreinsured share in the ceded business. In light of the history of negotiations between the parties, it is obvious that Warranty No. 2 was added to the slip solely for the purpose of insuring that NERCO would retain some significant risk from the ceded business. NERCO's interpretation of the slip language, permit-

---

**18.** The slip language contained in the December 13, 1979 telex is substantially identical to that contained in the slip actually initialed by plaintiffs.

**19.** Warranty No. 2 is included in the slip, but not in the SANS treaty wording itself. The parties appear to agree that where there is a conflict between the treaty wording and the slip wording, the treaty should be reformed to be consistent with the slip. Since the Court of Appeals affirmed the trial judge's finding that NERCO breached Warranty No. 2, there is no question as to whether the slip language was binding on NERCO.

ting NERCO to reinsure its 10% share, is implausible because it would render Warranty No. 2 virtually meaningless. *See Shea v. Bay State Gas Co.,* 383 Mass. 218, 225, 418 N.E.2d 597 (1981) ("It is neither reasonable nor practical to interpret [a contract] clause as being meaningless."); *Baybank Middlesex v. 1200 Beacon Properties,* 760 F.Supp. 957, 963 (D.Mass.1991) ("A contract must ... be interpreted as a whole and effect must be given to all of its provisions in order to effectuate its overall purpose.").

Moreover, when the slip is read as a whole, it does not appear to be as facially ambiguous as NERCO would have it. The slip describes a surplus share treaty, under which the reinsured retains a fixed amount of each risk, and the remainder of each risk (i.e. the surplus) is allocated to the treaty participants according to their respective shares. The slip required NERCO to retain a fixed amount of $250,000 per risk, an amount referred to in the slip as NERCO's "net retention," and it was on this "net retention" that NERCO was explicitly permitted to obtain additional reinsurance.

Warranty No. 2 makes no reference to this "net retention." Rather, it required NERCO to "co-reinsure for 10% participation on all 'system business' ceded hereunder." This language clearly refers not to the requirement that NERCO retain the first $250,000 on each risk, but to an additional requirement that NERCO "participate" in the treaty by "co-reinsuring" 10% of the ceded surplus. Since the 10% participation is distinct from and in addition to the $250,000 per risk net

retention, the slip language permitting reinsurance of the net retention does not in any way negate NERCO's independent obligation to retain a 10% share of the ceded surplus risk.

Since I find that the slip language was unambiguous, I conclude that NERCO's breach of Warranty No. 2, as found by the first trial judge, was intentional. I further conclude that NERCO's failure to disclose this breach must also have been intentional, and therefore constituted fraudulent concealment within the meaning M.G.L. ch. 260 § 12.[20]

### 3. *Plaintiffs' Knowledge*

 Having determined that NERCO intentionally breached its duty to disclose operative facts to plaintiffs, I now turn to the question of whether NERCO successfully "concealed the existence" of these facts from plaintiffs. *Puritan,* 413 Mass. at 175, 596 N.E.2d 1004. As with other elements of a fraudulent concealment claim, the burden of proving ignorance of the operative facts rests with plaintiffs. *Friedman v. Jablonski,* 371 Mass. 482, 487, 358 N.E.2d 994 (1976).[21]

#### a. *Fraud Claims*

 Here, the defendants contend that even if they had a fiduciary duty of disclosure, plaintiffs' fraud claims are not saved because they had actual or constructive knowledge of the facts upon which their claims are based. Defendants point to a number of factors which they claim should

---

20. In addition to reexamining the fraud and Warranty No. 2 claims, the Court of Appeals also instructed this court to determine in the first instance whether NERCO's underwriting was "so entirely inadequate" as to violate its contractual obligation to underwrite. Because the parties have not yet submitted memoranda or identified evidence in support of their respective positions on this issue, the court is not presently in a position to make findings relative to any related statute of limitations defenses. Accordingly, I will defer consideration of any statute of limitations defenses to "failure to underwrite" claims until such time as the substantive claims have been adequately addressed by the parties.

Similarly, the Court of Appeals left open the possibility that plaintiffs might make out a Chapter 93A case, although on grounds other than

those found by the original trial judge. As with the "failure to underwrite claims" I will defer consideration of any statute of limitations defenses with respect to chapter 93A claims until such time as the parties address the substance of those claims.

21. As a general rule, tolling on account of fraudulent concealment also ends when the plaintiff has "full means of detecting the fraud." *Tracerlab,* 313 F.2d at 102. However, in a case such as this one, where fraudulent concealment arises from the breach of a duty to disclose, the limitations period continues to be tolled even where the plaintiff had the ability to discover the cause of action through other means but failed to do so. *Puritan Medical Center,* 413 Mass. at 177 n. 9, 596 N.E.2d 1004.

have put the plaintiffs on notice that something was amiss. First, defendants contend that the operative facts were provided in the Anniversary Informations (AIs) which NERCO distributed to plaintiffs prior to each year's renewal of the treaties, as well as in response to specific inquiries of certain plaintiffs. In addition, defendants contend that because all of the plaintiffs eventually and permanently stopped paying claims under the treaties, they must have been aware that something was wrong, and were required to investigate the source of wrongdoing.

### (1) *Direct Evidence of Plaintiffs' Knowledge*

The fraud claims remaining in this case relate to NERCO's representation that risks under the SANS treaties would be obtained directly from primary insurers, without the use of intermediaries. Plaintiffs were first made aware of NERCO's use of intermediaries in late 1980. It was then that NERCO issued its 1981 AI, the annual report which described the business which had already been ceded under the 1980 SANS treaty. The 1981 AI revealed that all of the non-system business NERCO had ceded in 1980 had been obtained through Baccala & Shoop ("B & S"), an insurance MGA well-known on the London market. Indeed, the 1981 AI contained the following statement:

> To date, the preponderance of the business has been assumed from First State Insurance Company and written on a pro rata basis. Non–System business represents a relatively small proportion of the total and what has been written is limited to Casualty business on an excess of loss basis emanating from Baccala and Shoop Insurance Services.

The detailed breakdown of business contained in the AI revealed that over 95% of the business ceded in 1980 was "system" business which originated from companies within the Hartford Group. The remainder, "non-system" business, constituted less than 5% of the total. But, as the paragraph quoted above indicates, 100% of that business was

obtained from B & S. Since B & S is exactly the type of intermediary the use of which plaintiffs object to, it seems clear that plaintiffs had notice as of the date of the 1981 AI that NERCO had used such intermediaries in breach of the representations made in 1979.

Plaintiffs apparently concede that the information contained in the 1981 AI put them on notice as to any breaches which occurred in 1980. They nonetheless contend that their fraud claims for the remaining treaty years remain viable because NERCO essentially renewed its initial (i.e. 1979) misrepresentation by the following statement in the 1981 AI:

> Because of the competitive climate in the United States, Non–System business will develop more slowly than originally anticipated. It continues to be the posture of Graham–Watson not to seek business on a wholesale basis but rather to develop close working relationship [sic] with selected primary sources.

Thus, plaintiffs contend that notwithstanding their knowledge of the use of intermediaries in 1980, the 1981 AI assured them that intermediaries would be avoided if at all possible under the 1981 SANS treaty.

Defendants respond that even if this language constituted a new misrepresentation on NERCO's part, it was belied by information in at least one version of their 1982 AI, issued in late 1981. This AI also indicated that part of NERCO's business came through B & S, although it was less explicit than the 1981 AI in addressing the scope of B & S's involvement. It merely listed nine insurance companies as the "current sources of business" under the 1981 treaty, without providing a more specific breakdown as to system or non-system business. One of the listed companies, Twin City, had the notation "per Baccala and Shoop Insurance Services." The impact of this notation was diluted, however, because numerous other "non-system" insurance companies were listed, falsely as it turned out, as sources of business under the treaty.[22] This inclusion misleadingly sug-

---

**22.** The AI listed the following as sources of business during 1981: First State, "Twin City (per Baccala & Shoop)," St. Paul Fire & Marine,

Northbrook, Crum & Forster, CNA, Royal, Chubb, and Aetna. As it turned out, CNA, Royal

gested that B & S was only one of numerous sources of non-system business.

Moreover, the evidence does not clearly establish which plaintiffs actually received the version of the 1982 AI described above. At least some plaintiffs received a version of the 1982 AI which indicated only that Twin City was part of the Hartford Group, but did not reveal that B & S played any role. These plaintiffs thus received absolutely no information about B & S's role in 1982.

Finally, the 1983 AI (issued in late 1982) gave no indication of the use of intermediaries in the previous year, nor did it make representations concerning whether or not intermediaries would be used in the 1983 treaty year. It did state, however, that "the ... treaties are continuing for 1983 basically as before."

In addition to receiving the AIs which NERCO issued, many of the plaintiffs received information from NERCO after making specific inquiries. On October 25, 1984, plaintiff Imperio Re's managing director wrote to Cameron & Colby (NERCO's agent) and noted that he had been advised that B & S contributed to 65% of the losses incurred in 1983. Although the letter states a concern about large losses emanating from B & S, there is no objection in the letter to the use of B & S *per se.*

Ralph Bailey, the underwriter for plaintiffs Terra Nova and the Aurora Group, specifically raised the question of the use of B & S with NERCO during a visit to Boston in 1981. It appears that Bailey reluctantly accepted the use of B & S at that time. In addition, a memorandum prepared in 1986 by Christopher Burbidge, a Terra Nova employee, states as follows:

> Terra Nova and other London Underwriters ... became aware of potential for serious underwriting losses by mid–1982 and began requesting explanations for severe losses. It soon became apparent that much of the so-called Facultative business was in fact Automatic Binders given to brokers and agents, in particular an au-

thority to Baccala and Shoop which was used as reinsurance of the Nutmeg [another company in the Hartford Group] and, therefore, treated as 'System' business. In order to recover credibility with the above mentioned underwriters, Nerco entered into special reinsurance arrangements in late 1983/84 to make 'reparation'. These agreements are unilateral and each is different. The contract given to Terra Nova covers four sections of business unconnected with the Graham–Watson treaties and will become a total loss. Recoveries are timed but final losses will amount to $4,100,000 less premiums of $710,000. It is believed that at the time of negotiating this special arrangement it was thought that it should be sufficient to cover the Graham–Watson deficit, more or less.

The clear implication of this memo is that Terra Nova (presumably in the person of Ralph Bailey) was aware of the role of B & S no later than late 1983, demanded compensation for the resulting lower quality of the ceded business, and in fact received compensation in the form of a contract for reinsurance of other business unrelated to the SANS treaties.

Eric Vernhes, the underwriter for plaintiff Corifrance, knew that B & S was a "kind of underwriting organization." In 1983, he told Graves Hewett, the head of Cameron & Colby, that he was displeased that NERCO had ceded business from B & S, since Corifrance had not agreed to accept such business.

NERCO also points out that, whatever the significance of its own statements to plaintiffs, many of the plaintiffs permanently ceased paying claims under the SANS treaties many years prior to the start of this litigation, suggesting that they already suspected at that time that NERCO had engaged in wrongful conduct. As early as December, 1982, plaintiff Kansa Re [23] ceased paying claims. Plaintiff Hanseatica stopped paying in December, 1983. In 1984, Group Josi Re, Imperio Re, Industrial Mutual, Tapiola and the members of the TGI Anstalt pool

---

and Chubb did not actually provide any business under the 1981 treaty.

**23.** The action by plaintiff Kansa Re is currently stayed by order of the United States Bankruptcy Court for the Southern District of New York.

all stopped paying claims. In 1985, Corifrance and Universale stopped paying, and in 1986, all of the remaining plaintiffs stopped paying.

Based on this evidence, I conclude as follows:

1) All of the plaintiffs' fraud claims relating to the 1980 treaty are barred by the statute of limitations since all plaintiffs received notice, in the 1981 AI, of the role which B & S played in the non-System business during 1980. Even if plaintiffs were not aware of the precise role played by B & S, the phrase "emanating from Baccala and Shoop" should have put plaintiffs on notice that the business was not obtained directly from an primary insurer.

2) Fraud claims relating to the 1981 treaty are not barred solely because of the references to B & S in certain 1982 AIs. Those AIs listed nine sources of business: First State, Twin City (per B & S), St. Paul Fire & Marine, Northbrook, Crum & Forster, CNA, Royal, Chubb, and Aetna. To the extent that the plaintiffs who had signed on to the 1981 treaty had been led to believe (and reasonably did believe) that NERCO intended to obtain most of its non-System business directly from primary insurers,[24] the disclosure in the 1982 AI was misleading. It stated that business had been obtained from three non-System companies, CNA, Royal, and Chubb, when in fact the evidence is that no business had been obtained from them. Moreover, because NERCO had an affirmative duty to disclose material facts, its failure

to disclose that B & S had in fact accounted for virtually all of the non-System business in 1981 was (again assuming that the earlier misrepresentation was operative) affirmatively misleading.[25]

3) All fraud claims by Terra Nova and the Aurora Underwriters group are barred because Ralph Bailey, who was the underwriter for both Terra Nova and Aurora, was aware of and agreed to B & S's role during his 1981 visit to Boston and because, in 1983, Terra Nova negotiated "reparation" with NERCO on the very issue of B & S's role in all four of the SANS treaties.[26]

4) All fraud claims by Corifrance are barred because Eric Vernhes, the Corifrance underwriter, was specifically aware in 1983 that a large part of the business ceded under the SANS treaties was non-System business from B & S.

5) All fraud claims by Imperio Re are barred because Imperio Re had notice, in 1984, that B & S had accounted for 65% of losses in 1983.

6) All fraud claims by plaintiffs who stopped paying claims under the SANS treaties prior to July 12, 1985 are barred.[27] The duty of *uberrimae fidei* is a reciprocal one. Plaintiffs could rely on NERCO's utmost good faith but were, accordingly, required to pay all claims presented to them under the SANS treaties. *Compagnie*, 57 F.3d at 88–89. When plaintiffs stopped paying, they indicated to NERCO that they were no longer relying on NERCO's *uberrimae fidei*, and thus terminated any reciprocal obligation of

24. An issue I do not decide at this time.

25. Defendants claim that plaintiffs had an obligation to make inquiries because of the poor performance of the SANS treaties. But the SANS treaties actually performed better than the industry as a whole, and there was nothing about their poor performance which suggested that the use of intermediaries was the culprit.

26. Plaintiffs point out that Bailey ceased to act as an underwriter for Aurora after 1982. Indeed, the record reflects that Aurora did not participate in the 1983 SANS treaty. Because I conclude that Bailey had knowledge of the B & S role from his 1981 meeting in Boston, and attribute that knowledge to Aurora, this fact does not change my conclusion that Aurora was aware of the role of B & S prior to July 12, 1985.

27. The record is clear that plaintiff Hanseatica stopped paying after December, 1993, therefore its fraud claims are barred.

The record is also clear that Group Josi Re, Imperio Re, Industrial Mutual, Tapiola and the TGI participants all stopped paying by December, 1984 at the latest. Accordingly, all of their fraud claims are barred.

Corifrance and Universale paid through June, 1985. Their next payment was not due until after July 12, 1985. Accordingly, their claims are not barred because of their cessation of payments.

The remaining plaintiffs stopped paying after July 12, 1985, and are therefore not affected by this finding.

**1004**

disclosure on NERCO's part. At that point, their relationship with NERCO became arm's-length, and they were obligated to investigate any wrongdoing by NERCO which would have justified their cessation of payments.

### (2) *Evidence of Plaintiffs' Lack of Knowledge*

■ Defendants contend that the fraud claims of the plaintiffs who have not been specifically shown to have been aware of NERCO's use of B & S as an intermediary should still be barred because those plaintiffs have not satisfied their burden of affirmatively proving that they were *not* aware of this fact. *See Friedman v. Jablonski,* 371 Mass. 482, 487, 358 N.E.2d 994 (1976); *Berkson v. Del Monte Corp.,* 743 F.2d 53, 55 (1st Cir. 1984). Defendants claim that because some of the plaintiffs were or should have been aware of the role of B & S prior to July 12, 1985, there is a strong inference that the remaining plaintiffs, all of which are jointly represented by common counsel, may have been aware B & S's role as well.

Plaintiffs do not deny that they bear the burden of proof in this regard. The contend, however, that they have met their burden, through a combination of direct and circumstantial evidence, of proving that they were not aware of B & S's role prior to July 12, 1985.

The most striking fact about the record evidence concerning plaintiffs' lack of knowledge is just how little of it the plaintiffs produced. Facts concerning plaintiffs' own knowledge are uniquely within their possession,[28] yet only three of the thirty-one plaintiffs called even a single witness to testify concerning lack of knowledge. *Cf. Knightsbridge Marketing v. Promociones Y Proyectos,* 728 F.2d 572, 575 (1st Cir.1984) (negative inference may be drawn by party's failure to produce evidence under its control).

The three plaintiffs who produced witnesses to testify as to lack of knowledge were the Kellett Syndicate, the Cassidy Syndicate and Uni–Storebrand. Bryan Kellett testified

for the Kellett syndicate. He was asked on redirect examination why he failed to complain about the SANS treaties prior to an inspection of NERCO's books in 1987. He stated "Because I didn't know anything was wrong until I got [the inspector's] report."

Kellett's testimony is at best ambiguous. To obtain the benefit of the fraudulent concealment exception to the statute of limitations, each plaintiff must prove that it was not aware of the facts underlying this lawsuit. For Kellett to say that he "didn't know anything was wrong" is as much a statement about his judgment as it is about his knowledge of facts. It could easily mean that he did not interpret the facts of which he was aware as being actionable until he received an inspector's report suggesting that this was so.

Tony Cassidy testified on behalf of the Cassidy syndicate. He testified that he did not know in 1982 that business was not being facultatively underwritten. He admitted on cross-examination, however, that he had earlier testified that he had been aware that NERCO was using "semi-automatic" (i.e. allegedly non-facultative) methods. In any event, this testimony is irrelevant to plaintiff's fraud claims, which relate to NERCO's use of B & S as an intermediary, not to its use of semiautomatic underwriting, and therefore cannot serve to satisfy plaintiffs' burden.

Finally, Per Hodne testified for Uni–Storebrand. He testified as follows:

Q. It is a fact, is it not, that you yourself, aside from what you were told by lawyers, did not have any knowledge yourself of any misrepresentation by NERCO or any broker with respect to the placement of the SANS Treaties?

A. That is correct.

Q. And when you decided to terminate your participation in the contract, you personally had no knowledge of any misrepresentation made by NERCO or any broker concerning the placing of these treaties. That is correct, is it not?

---

**28.** For this reason, plaintiffs' argument that the burden of proving a negative is somehow lower than in the ordinary case is misplaced.

A. That is correct. We had an extremely high regard for their company at that time.

This testimony comes closest to satisfying plaintiff's burden, since it contains a clear statement that Uni–Storebrand was not aware that NERCO had made misrepresentations until the commencement of this litigation. I cannot, however, credit such a broad claim of ignorance. As the earlier discussion demonstrated, all plaintiffs were aware that NERCO had made a misrepresentation with respect to the 1980 SANS treaty, since all plaintiffs were given notice of B & S's role during that year. Thus, as with Bryan Kellett's testimony, Hodne seems to be stating his opinion of NERCO's conduct rather than fully accounting for his factual knowledge during the relevant period.

The remaining plaintiffs have presented no evidence as to their lack of knowledge, and instead argue that the chronology of events relating to the SANS treaties, taken as a whole, makes it more likely than not that they were not aware of the operative facts in this case prior to the beginning of the limitations period. They point out that the SANS treaties were managed in the United States by NERCO, and that it was NERCO who possessed the information underlying this lawsuit.[29] Although certain of the plaintiffs exercised their rights, as described *supra*, to request information from NERCO concerning the operation of the SANS treaties, plaintiffs contend that there is no reason to believe than any of the plaintiffs who did not inquire would have become aware of the operative facts prior to the commencement of the limitations period.

I am unconvinced. Plaintiffs may be right that there is no specific reason to believe that any of them (other than those discussed in the prior section) had knowledge of B & S's role prior to July 12, 1985. However, given the clear possibility of such knowledge, it is plaintiffs' burden to negate that possibility with evidence. Their burden was not onerous—simply to present representatives of each plaintiff to testify as to lack of knowledge—yet they failed to meet it.

In addition, plaintiffs point to circumstantial evidence which suggests that at least some of them were ignorant of operative facts. For example, plaintiffs point to a meeting which took place in Basel, Switzerland on July 9 and 10, 1985, between NERCO and certain plaintiffs (and other non-plaintiff reinsurers) who had participated in the SANS treaty through the Anglo–Swiss sub-broker. Prior to the meeting, NERCO had submitted a written response to a series of questions which had earlier been submitted by the reinsurers. Plaintiffs claim that by posing these questions, they demonstrated their ignorance at the time of certain facts. However, none of the reinsurers' questions related to the B & S issue, and thus shed no light on their knowledge at that time.

Finally, plaintiffs point out that when this action was originally commenced, they sought only injunctive relief in the form of an order requiring NERCO to submit to an inspection of its books and records. It was not until some 18 months later, after the court-ordered inspection had been completed, that plaintiffs amended their complaint to allege the claims at issue here. This, plaintiffs suggest, indicates that they were unaware of these claims until the amendment date, July 12, 1988. This reasoning is faulty, however, since it begs the question of why plaintiffs failed to allege these claims earlier. At least some of the plaintiffs were aware of some of the claims years earlier, yet failed to file suit.

In sum, there is literally no evidence as to when any of the plaintiffs first learned of the role that B & S played in obtaining non-System business under the SANS treaties. Because of this lack of evidence, I have no basis for finding that plaintiffs were unaware of the operative facts underlying their fraud claim prior to the commencement of the limitations period on July 12, 1988.

#### b. *Contract Claims*

 The limitations period for contract claims in Massachusetts is six years. *Com-*

---

**29.** Indeed, much of the communication between plaintiffs and NERCO took place through inter-mediaries.

*pagnie,* 57 F.3d at 88. Plaintiffs' Warranty No. 2 claims are thus barred unless tolled.

As explained above, I find that NERCO intentionally failed to disclose the existence of these claims. Thus, plaintiffs are entitled to a tolling of the limitations period if they can prove that they were in fact unaware of the operative facts as a result of this failure.

With respect to plaintiffs' knowledge of the operative facts regarding these claims, there is once again an almost complete lack of direct evidence. However, upon review of the all of the circumstantial evidence I find it more likely than not that plaintiffs were unaware of any potential contract claims prior to July 12, 1982.

The difference between the evidence of plaintiffs' knowledge with respect to the fraud claims and contractual claims is illustrative: With respect to plaintiffs' tort claims, I found that many of the plaintiffs were aware that B & S played a role obtaining the non-System business prior to the limitations period. I concluded that it was therefore at least plausible that any or all of the plaintiffs were aware of B & S's role prior to the limitations period, and therefore fair to hold plaintiffs to their burden of disproving their knowledge.

 By contrast, there is no evidence in this case that anyone outside of NERCO was aware of NERCO's failure to maintain its net retention prior to July 12, 1982. Moreover, given the overall relationship between the parties, and plaintiff's reliance on *uberrimae fidei,* it seems very unlikely that plaintiffs would have obtained this information at such an early date. Warranty No. 2 was only

included in the 1980 and 1981 treaties. July 12, 1982 is only 6 months after the 1981 treaty expired. At the time, plaintiffs were still on good terms with NERCO, most of them having continued participating in the SANS treaties through the end of 1983. I therefore conclude that 1) it is more likely than not that none of the plaintiffs made specific inquiries or in any other way investigated NERCO's compliance with Warranty No. 2 prior to the end of 1983 and therefore 2) it is more likely than not that all plaintiffs remained ignorant of the operative facts underlying their Warranty No. 2 claims until after July 12, 1982. I thus find that these claims were brought within the period prescribed by the statute of limitations.[30]

### III. CONCLUSION

For the foregoing reasons, the court finds that all of plaintiff's fraud claims are barred by the statute of limitations. Moreover, the court finds that none of plaintiffs' Warranty No. 2 claims are barred by the statute of limitations.

This memorandum constitutes the Court's findings of fact and rulings of law on the issue of defendants' statute of limitations defenses for the purposes of Fed.R.Civ.P. 52.

The parties shall each submit within two weeks of the date of this order a proposed schedule for further briefing on the remaining issues in this case.

**SO ORDERED.**

---

30. In making this finding, I reject NERCO's assertion that plaintiffs were obligated to have exercised their right under the SANS treaties to inspect NERCO's books in order to preserve their claim of fraudulent concealment. Plaintiffs were entitled to rely on NERCO's duty to disclose. *Puritan Medical Center,* 413 Mass. at 177, n. 9, 596 N.E.2d 1004.

Moreover, I find nothing in the record to support NERCO's claim that plaintiffs had sufficient "storm warnings" that something was sufficiently amiss so as to obligate them to inspect NERCO's books. While it is true that the SANS treaties performed disastrously from the outset, it is also the case that the treaties performed better than the market as a whole. In an environment in which the entire insurance industry was suf-

fering disastrous losses, poor losses from the SANS treaties gave plaintiffs no notice that NERCO was possibly in breach of its obligations. To the contrary, it would have been perfectly reasonable for plaintiffs to assume that, like the rest of the market, the SANS treaties were suffering high losses due to external factors outside of NERCO's control.

I also note that contrary to NERCO's implication, it was not a trivial matter for plaintiffs to exercise their right of inspection. A number of plaintiffs attempted to inspect NERCO's books in 1985, and were only permitted to conduct a limited inspection which did not produce evidence of wrongdoing. It was not until this court ordered a full inspection in 1987 that the factual bases for plaintiff's claims were fully disclosed.