**RELIANCE NATIONAL INSURANCE COMPANY (EUROPE) LTD.**

v.

**Alain HANOVER and Daniel Hanover**

**No. CIV.A.00–11202–RGS.**

United States District Court, D. Massachusetts.

July 22, 2002.

Cheryl Enright, Morrison, Mahoney & Miller, Boston, Steven Goldman, Fort Lauderdale, FL, Bryan E. Chase, Larson & King, LLP, Boston, MA, for Reliance National Insurance Co., Plaintiff.

Robert S. Wolfe, Wolfe Associates, Gloucester, MA, for Alain J. Hanover, Daniel A. Hanover, Defendants.

## *MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT*

STEARNS, District Judge.

On February 23, 2000, the STIARNA, a 12 meter sailboat owned by defendants Alain Hanover and Daniel Hanover, caught fire and sank while ferrying between Trinidad and Grenada. After rejecting the Hanovers' claim for the loss of the boat, plaintiff Reliance National Insurance Company (Europe) Ltd. (Reliance)[1] brought

---

1. Reliance ceased its marine underwriting business in February of 2000, after its parent, Reliance National Insurance Company, was declared insolvent by the Insurance Department of the Commonwealth of Pennsylvania. Reliance (Europe), although inactive, is solvent.

this declaratory action seeking the court's imprimatur of its decision to rescind coverage. The Hanovers counterclaimed, alleging breach of contract, unjust enrichment and "bad faith." Both sides now move for summary judgment.

## BACKGROUND

Alain Hanover is a wealthy Massachusetts businessman. Daniel Hanover is his son. The Hanovers, sailors of some experience, decided to buy a full-fledged yacht.[2] In October of 1999, Alain Hanover saw an ad for the STIARNA on the website of the Authentic Yacht Brokerage (AYB). The STIARNA had been built in 1937 by Camper & Nicholson, a British shipwright of longstanding reputation. The STIARNA had an asking price of $250,000. According to the website listing, $800,000 had been spent on her refurbishment in the late 1980s. The ad claimed that the STIARNA had since been "carefully maintained." The STIARNA was described, in nautical parlance, as "85% of excellent."

In December of 1999, Douglas Coupar, an AYB employee, faxed the Hanovers a copy of a 1999 survey of the STIARNA.[3] The survey deemed most of the yacht's systems as "very good" or "excellent." However, the steel framing was described as only "average 30% needs reinforcement or replacing." The survey also noted that the engine "smoked" and needed new "valve sleeves", that the mast required a new stay, and that the electrical system needed repair.

Coupar arranged for the Hanovers to inspect the STIARNA in Trinidad on January 15, 2000. The Hanovers met the STIARNA's owner, Donald Steinmeyer, and took the vessel for a sea trial. The STIARNA performed "beautifully" under full sail. The Hanovers did notice that the

bright work (exterior varnish) had deteriorated. They also had difficulty starting the engine. Alain Hanover concluded that, while the STIARNA was in less than its advertised "impeccable" condition, the 1999 survey was essentially accurate. The Hanovers agreed to pay $130,000 for the boat.

After consulting with Fred Thomas of Shipwrights, Ltd., who had been the STIARNA's caretaker, the Hanovers decided to replace the STIARNA's engine, iron ribs, hull planking, and the stem, keel and horn timbers. Thomas estimated that the refitting would cost $250,000 and take sixty days. The Hanovers also decided to refurbish the STIARNA's interior once the structural work was done, at an expected cost of $450,000. The Hanovers commissioned Thomas to do the initial refitting at his shipyard, which had been recently relocated on the island of Grenada (some seventy miles from Trinidad).

Alain Hanover asked Coupar to obtain insurance for the STIARNA. Coupar recommended UFANS, a Canadian marine insurance broker. Alain Hanover requested that Coupar forward the AYB listing and the 1999 survey to UFANS. Coupar did so and asked UFANS to fax Alain Hanover an insurance application. The application stated in pertinent part:

1. This application will be incorporated in Its entirety into any relevant policy of insurance where insurers have relied upon the information contained herein.

2. Any misrepresentations in this application for insurance will render insurance coverage null and void from inception. Please therefore check to make sure that all questions have

---

2. The Hanovers had briefly owned a smaller sailboat prior to their purchase of the STIARNA.

3. In nautical-speak, a survey is a comprehensive appraisal of a ship and its systems.

been fully answered and that all facts material to your insurance have been disclosed, if necessary by a supplement to the application.

Alain Hanover completed the UFANS application on January 25, 2000. He stated that the STIARNA had been built in 1937, that her engine had been installed in 1957, and that the Hanovers had bought her for $150,000.[4]

UFANS was a correspondent producer for TL Dallas, Reliance's yachting underwriter. On January 27, 2000, Cedric Miller of UFANS sent TL Dallas a sixteen-page fax. The fax stated in pertinent part:

> Here is one to get your teeth into... a U.S. buyer Alain Hanover ... will be taking the yacht from Trinidad to Grenada very shortly for some work to be done and then will sail vessel back up to the U.S. ... In the Fall she will undergo further refurbishment etc.
>
> The purchase price as is will be U.S. $150,000 and that is the amount we require to insure until work is done in Grenada (approx. 60 days). Thereafter we will need to increase the value for the next part of the voyage.
>
> Trinidad to Grenada is less than 100 miles so I would suggest a full survey be required after the work has been done in Grenada and a new value is established.

The fax included a copy of Hanover's application, a printout of the AYB website listing, and a copy of the 1999 survey. No details were provided about the refitting work to be done in Grenada.

Beric Usher, an underwriter at TL Dallas, reviewed the application. On January 31, 2000, Usher faxed UFANS, offering to insure the STIARNA subject to certain conditions. One of the conditions was: "New out of water survey required after refit and prior to voyage to Boston."[5] The same day, UFANS faxed the Hanovers confirmation of the coverage subject to the special conditions.[6] On February 3, 2000, TL Dallas faxed a second quote to UFANS with higher limits and an increased premium to cover "crew liability for the voyage from Grenada to Boston (captain and 3 crew)." On February 3, 2000, UFANS notified the Hanovers that it would "bind coverage" at the higher premium. The same day, UFANS confirmed the binder by fax to TL Dallas. In the fax, UFANS stated that "vessel is leaving Trinidad Feb. 20th for Grenada then refit will occur at Ship Wrights, St. Davids Harbor." UFANS issued an invoice in the amount of $4,300, which the Hanovers paid on February 4, 2000. TL Dallas then issued a temporary cover note to the Hanovers as the insureds and to UFANS as the producer. TL Dallas also asked UFANS to have Alain Hanover sign a second application form with more complete information. Alain Hanover signed the second application on February 14, 2000.[7]

Immediately prior to the February 20, 2000 closing, the Hanovers retained Eric Wiberg, a professional captain, and flew to Trinidad to prepare the STIARNA for the trip to Grenada. With Thomas's and Wiberg's assistance, they set about to replace the defective mast stay. When Wiberg

4. Alain Hanover had told Cedric Miller of UFANS that he had paid $130,000 for the STIARNA, but expected to spend at least $20,000 to prepare her for the trip to Grenada.

5. Usher was aware that the Hanovers intended to increase the coverage limits after the STIARNA was refitted.

6. According to the Insurance Institute of America, a survey should be routinely conducted before hull insurance is bound.

7. UFANS faxed the second application to TL Dallas on February 28, 2000, after the STIARNA was lost.

removed the radar housing from the mast, he observed rot. Thomas also saw that there was a separation at the scarf joint. The Hanovers decided that they would replace the mast during the refit in Grenada.[8] Thomas concluded that the vessel was seaworthy and fit for the short voyage to Trinidad.

To aid the passage, the Hanovers chartered a commercial vessel, the Calypso II, to accompany the STIARNA. Wiberg recommended the auxiliary charter because the STIARNA would be traveling at night in strong currents over shallow waters.[9] The STIARNA and the Calypso II left Trinidad for Grenada on February 23, 2000, at 6:00 a.m. Fire broke out in the engine room at approximately 7:00 a.m. The crew fought the fire without success, and the STIARNA sank. Reliance became aware of the loss no later than February 28, 2000.[10]

TL Dallas employed Douglas Wager to determine the loss. Wager obtained the official casualty reports, took statements from crew members, and gathered affidavits from the Hanovers and from Wiberg. As of February 28, 2000, Wager advised TL Dallas to establish a reserve of $150,000.

On April 4, 2000 Wager wrote his preliminary report to TL Dallas.

1. This accident is wholly fortuitous and did not occur out of any intentional effort or omission of the assureds.

2. The assureds have a documentable investment at the time of loss, which clearly is in the range of the $150,000 amount of insurance.

\* \* \* \* \* \*

4. The unusual circumstances of this accident lead to a cynical suspicion that this aged vessel might not have been in a seaworthy condition on departure from Trinidad. However, the only credible evidence that this vessel was not in a seaworthy condition at the time of departure comes from the assured's own post loss written statement in which "considerable rot and damage" was reported.... The dry rot in the mast was discovered after the purchase and was verbally reported to us by Wiberg. It is equally noteworthy that the loss apparently did not originate from the known suspected deficient conditions.

While the unusual employment of the M/V Calypso II also suggests to the cynic a knowledge of potentially dangerous conditions, it is clearly possible that this safety measure can be accounted for solely as a "belt and suspenders" action of a wealthy careful yachtsman.

5. ... The assured's plans for rehabilitation of the vessel were clearly and fully disclosed to the insurance broker and presumably to the UK insurers, thus suggesting that the vessel's condition and need of repairs was known to all parties.

Mark Thomas of TL Dallas responded to the report with an acerbic request that Wager "answer with full particularity why it is your view that a sailing vessel is seaworthy notwithstanding an inability to navigate safely under sail. When responding please restrict your answers to the above and not engage yourselves [sic] in pure speculation as to the intention, character of the assured or otherwise." On

8. In Thomas's opinion, the rotted mast posed a danger only if the vessel was "loaded with a full set of sails in a heavy wind in heavy seas." Thomas Aff., at 3.

9. Wiberg was also concerned about the reliability of the aging engine.

10. On March 1, 2000, TL Dallas issued its cover note and policy effective February 3, 2000.

April 26, 2002, Wager responded to Thomas/TL Dallas that because of the rot in the mast, the STIARNA "was not fit for its intended service and could not have navigated safely under sail."

On July 3, 2000, Reliance issued an endorsement to the policy cancelling all coverage "from inception." [11] On July 10, 2000, UFANS returned $1,300 to the Hanovers as a refund of the premium for crew liability for the voyage from Grenada to Boston. UFANS stated that "it is our understanding that further correspondence from underwriters regarding the total loss should be with you by the 21st of July."

Reliance filed this declaratory action in admiralty on June 19, 2000. The Hanovers counterclaimed for breach of contract, unjust enrichment, and "bad faith," requesting a jury trial.

## DISCUSSION

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Gaskell v. Harvard Co-op. Soc'y*, 3 F.3d 495, 497 (1st Cir.1993). "In this context, 'genuine' means that the evidence is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Rodriguez–Pinto v. Tirado–Delgado*, 982 F.2d 34, 38 (1st Cir.1993). To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position. *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). The burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* The nonmovant cannot simply rest upon

mere allegations, but must adduce specific, provable facts which establish that there is a triable issue. *Id.* "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Id.* quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact." *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993).

Admiralty jurisdiction over a suit involving a marine insurance policy "is unquestionable." *Windsor Mount Joy Mut. Ins., Co. v. Giragosian*, 57 F.3d 50, 54 (1st Cir.1995). While, broadly speaking, there is no constitutional right to a jury trial in an admiralty action, the "savings to suitors" clause, 28 U.S.C. § 1333(1), reserves common law remedies to a plaintiff "in all cases where the common law is competent to give it." *Leon v. Galceran*, 78 U.S. (11 Wall) 185, 191, 20 L.Ed. 74 (1870). Ordinarily, a plaintiff signals its election of remedies by its choice of fora or by designating its jurisdictional choice pursuant to Fed.R.Civ.P. 9(h). There is, however, a complication. When a claim brought in admiralty triggers a compulsory counterclaim for which a defendant (plaintiff-in-counterclaim) requests a jury trial, the result is a "hybrid" proceeding. *See Concordia Co., Inc. v. Panek*, 115 F.3d 67, 70–72 (1st Cir.1997). While there is no uniform answer to the question as to how a

---

11. In its brief, Reliance gives two reasons for the cancellation of the policy: "(1) that the vessel was not the way it was originally described to us in terms of its condition; (2) that the vessel was not seaworthy at the inception of the policy."

court is to proceed in a hybrid case, it is required to do its utmost to protect a party's right to a jury trial. *See Koch Fuels v. Cargo of 13,000 Barrels of No. 2 Oil,* 704 F.2d 1038, 1041–1042 (8th Cir. 1983).[12]

■■■ The parties agree that the issue of the STIARNA'S "seaworthiness" can only be resolved by a fact-finding jury or court sitting in admiralty. Reliance contends, however, that it is entitled to judgment as a matter of law based on one undisputed fact: that Alain Hanover represented that he had paid $150,000 for the STIARNA, when in fact the true purchase price was $130,000. Reliance invokes the admiralty doctrine of *uberimmae fidei.*[13]

> [T]he doctrine [of *uberrimae fidei* ] requires the parties to a marine insurance policy to accord one another the highest degree of good faith.... In particular, the doctrine imposes a strict duty on the insured to disclose to the insurer all known circumstances that materially affect the insurer's risk, the default of which duty renders the insurance contract voidable by the insurer. Once policy coverage has commenced, the doctrine imposes an equally strict, continuing obligation on the vessel owner to ensure that the vessel will not, through either bad faith or neglect, knowingly be permitted to break ground in an unseaworthy condition. The doctrine has long been considered to be one of limited applicability, however, in light of the Supreme Court's *Wilburn Boat v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955) decision, *see* 348 U.S. at 316–317, 75 S.Ct. 368 (explaining limitations of doctrine in marine insurance contract context). Whatever the exact extent of the applicability of the strict *uberrimae fidei* standard, we cannot believe that in these times it requires a pleasure boat owner to notify the insurer every time the craft takes on a small amount of water, or has engine trouble, at pain of losing coverage.

*Windsor Mount Joy,* 57 F.3d at 54–55 (citations omitted). *See also Underwriters at Lloyd's v. Giroire,* 27 F.Supp.2d 1306, 1310 (S.D.Fla.1998) (*uberrimae fidei* is a firmly entrenched, judicially-established doctrine). The standard for disclosure

> is an objective one, that is, whether a reasonable person in the assured's posi-

---

12. This is not the uniform rule. Some courts have held that a plaintiff's choice of admiralty trumps a counter-claiming defendant's right to a jury trial. *See e.g., Insurance Co. of N. Am. v. Virgilio,* 574 F.Supp. 48, 51 (S.D.Cal. 1983) (denying counter-claimant's jury demand in light of plaintiff's invocation of admiralty jurisdiction); *Camrex (Holdings) Ltd. v. Camrex Reliance Paint,* 90 F.R.D. 313, 317 (E.D.N.Y.1981) (same); *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Bauer Dredging,* 74 F.R.D. 461, 461 (1977) (same). These are largely older cases and should be reevaluated in light of the Supreme Court's recent emphasis on full protection of the right to a jury trial. *See Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The First Circuit has made no definitive statement on the issue, but my prediction is that it would favor an expansive application of the jury right.

13. Reliance also argues that the terms of the policy required the Hanovers to disclose any information material to the underwriting decision. Reliance represents that information regarding the deteriorated state of the vessel and its actual sale price would have influenced its decision whether or not to underwrite the policy on the STIARNA. Reliance argues that the "misrepresentation" regarding the purchase price alone is sufficient to establish materiality as a "matter of law." *See Pacific Insurance Co. v. Kent,* 120 F.Supp.2d 1205, 1211 (C.D.Cal.2000) (holding that where an insured intentionally misrepresented the purchase price of his sailboat, the insurer can rescind the policy even if the misrepresentation is not material). Whether considered under *uberimmae fidei* or the terms of the policy, the result is the same, as the policy terms simply seek to capture the full limits of the doctrine.

tion would know that the particular fact is material. To be material, the fact must be "something which would have controlled the underwriter's decision" to accept the risk. The assured's failure to meet this standard entitles the underwriter to void the policy *ab initio.*

*Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 13 (2d Cir.1986) (citations omitted) (no reasonable juror could find that an insurer providing virtually identical coverage would not want to know of the cancellation of the insured's prior policy).

The Hanovers provided Reliance with descriptive information about the STIARNA (its dimensions, the age of the hull, and the age of the engine), and the 1999 survey identifying problems with the hull, engine and mast. Reliance also knew that the Hanovers had determined that the STIARNA was in need of a major refit, and had waived the customary pre-insurance survey until the work was completed. Notwithstanding, Reliance argues that had Usher (the underwriter) known the STIARNA's "purchase price, [its] poor and neglected condition, and the true extent of the work to be done in Grenada," he would have declined coverage. Whether the $20,000 added by Alain Hanover to the purchase price was material to the insurance risk, in the sense that a reasonable underwriter, made aware of the fact that the Hanovers had paid $130,000, rather than $150,000, for a yacht listed at $250,000, would have refused to provide coverage as a result, and whether the disclosures that the Hanovers did make regarding the vessel's condition satisfied the duty of good faith, are questions of fact that cannot, on this record, be resolved as a matter of law.[14] *See Knight,* 804 F.2d at 14 (materiality of nondisclosed information

under the doctrine of *uberrimae fidei* is ordinarily a jury issue).

### *ORDER*

For the foregoing reasons, the cross-motions for summary judgment are *DENIED.*

SO ORDERED.

---

**14.** The Hanovers incurred expenses, over and above the purchase price, in preparing the