ST. PAUL FIRE AND MARINE IN-SURANCE COMPANY, Plaintiff and Counter–Defendant,

v.

HALIFAX TRAWLERS, INC., Defendant, Counter–Plaintiff and Third Party Plaintiff,

v.

Marine MGA, Inc., Third Party Defendant.

Civil Action No. 05–10760–JLT.

United States District Court, D. Massachusetts.

July 12, 2007.

---

Aaron A. Arzu, Duane Morris LLP, Boston, MA, Danielle Sullivan Kaminski, James W. Carbin, Duane Morris LLP, Newark, NJ, for Plaintiff and Counter–Defendant.

David B. Kaplan, The Kaplan/Bond Group, Boston, MA, for Counter–Plaintiff and Third Party Plaintiff.

Aaron A. Arzu, Matthew R. Roberts, Duane Morris LLP, Boston, MA, Danielle Sullivan Kaminski, Duane Morris LLP, Newark, NJ, for Third Party Defendant.

## MEMORANDUM

TAURO, District Judge.

In this maritime case, Plaintiff St. Paul Fire and Marine Insurance Company ("St. Paul") and Third Party Defendant Marine MGA, Inc. ("MGA") seek declaratory judgment against Defendant Halifax Trawlers, Inc. ("Halifax") to void a marine insurance policy for the Nicole II, a fishing vessel lost at sea. Presently at issue is St. Paul and MGA's *Motion for Summary Judgment* [# 48].

## I. Background

The following facts are drawn from the Parties' statements of material facts and

supporting documents.[1] Unless otherwise noted, all disputed facts have been resolved in favor of the non-moving party, Halifax.

St. Paul, a corporate entity organized and operated under the laws of Minnesota, provides insurance policies on marine hulls. Halifax is a commercial fishing outfit based in Halifax, Massachusetts, and is operated by its principal, Francis St. Croix ("St.Croix").

On November 5, 2004, St. Croix purchased a fifty-four foot, wood-hulled Thomaston fishing vessel named the Nicole II ("the Vessel") and promptly attempted to acquire insurance. St. Croix contacted Donna Duermyer ("Duermyer") of the Blackadar Marine Insurance Agency ("Blackadar"), to obtain a price quote and secure an insurance policy for the Vessel. St. Croix and Duermyer spoke on the phone in early November 2004 and discussed the terms and conditions associated with the coverage Halifax sought. During the conversation, Duermyer elicited information from St. Croix, which Duermyer contemporaneously recorded on the application for coverage ("the Application").

During the phone conversation, Duermyer broached the subject of "losses" with St. Croix. The Application contained a section for the prospective insured to disclose details of prior losses. St. Paul maintains that this "losses" section of the Application referred to the boat and required the applicant to disclose any and all losses associated with the boat. Halifax

counters that this part of the Application is ambiguous, and that St. Croix construed the question as a request for information related to losses of the individual seeking coverage.[2] St. Croix has been in the business of commercial fishing for many years and had never lost a vessel or crewman. As a result, St. Croix replied to the loss inquiry by stating "No." St. Croix and Duermyer left blank the subsequent portions of the Application asking "when," "description of loss" and "loss amount $." [3]

In conjunction with the Application, Halifax also submitted a Condition & Value Survey Report ("Survey Report") written by Marine Safety Consultants, Inc. ("MSC"). MSC had surveyed the Vessel on October 27, 2004, while it was afloat in Plymouth Harbor. As part of the Survey Report, MSC notes that "We were given an invoice of work done to the vessel in 2003, by D.N. Kelley & Sons Shipyard while the vessel was hauled for maintenance. This included having the entire bottom refastened with # 18x 4 inch screws." [4]

St. Paul asserts that the representation that the Vessel's bottom-side had been refastened in 2003 was a critical factor in its decision to insure the Vessel, as wooden-hulled boats experience deterioration of the water-tight seals between planks and corrosion of the metal fasteners holding the boat's planks together. According to St. Paul, failure to periodically refasten can result in a loss of hull strength and

---

1. See Halifax Trawler Inc.'s Statement of Disputed Material Facts [# 55] (hereinafter Halifax Material Facts); St. Paul Fire and Marine Ins. Co. and Marine MGA, Inc.'s Statement of Undisputed Material Facts in Supp. of Their Mot. for Summ. J. [# 50] (hereinafter St. Paul Material Facts).

2. Duermyer also believed that the losses section referred to prior losses of the person

seeking insurance rather than to prior losses of the boat. See Def.'s Exs. to Opp. to Summ. J. [# 58] (hereinafter Def.'s Exs.), Ex. 8., Duermyer Dep. 30:21–31:11, June 13, 2006.

3. See Def.'s Exs., Ex. 6 at 1.

4. Decl. John Sterling, Paper # 51, Ex. 2, Condition & Value Survey Report, p. 8. 3

impede the overall seaworthiness of a vessel.

Based on the information Halifax provided, St. Paul issued a policy of marine insurance for the Vessel, effective November 15, 2004, and terminating on November 15, 2005, through its underwriter, John Sterling ("Sterling") of Marine MGA, Inc.[5] The policy insured the Vessel in the amount of $177,000 and carried a $5,000 deductible.

On November 30, 2004, St. Croix piloted the Vessel for the first time. Shortly thereafter, on December 1, 2004, the Vessel sank to the bottom of the Atlantic Ocean approximately nine nautical miles off the coast of Scituate, Massachusetts. St. Paul contends that the vessel sank in "expectable" conditions, given the location and the time of year that the sinking occurred. Halifax disputes St. Paul's assessment of the conditions, and asserts that the Vessel sank in rough seas and high winds. Neither Halifax, nor St. Paul offers a comprehensive explanation as to why the Vessel never made it back to port. St. Croix had "absolutely no idea" what caused the sinking.[6]

In the immediate wake of the sinking, Halifax reported the incident to Blackadar and commenced claim proceedings with St. Paul. Halifax sought to recover on a total loss basis, given that the Vessel sunk miles from shore, in approximately two-hundred feet of water.

As part of the claim proceedings, St. Paul conducted an investigation of the Vessel's sinking. During the course of its investigation, St. Paul discovered that, in January of 2003, the Vessel had an incident while at dock in Plymouth, Massachusetts. The Vessel lost buoyancy and submerged in ten feet of water, with the hull resting on the bottom, where it sat for "four or five days at the most."[7] Because the vessel drew eight feet of water, it did not descend far in the shallow harbor. Nevertheless, water came up over the gunnels[8] and through the engine room.[9] Most of the Vessel submerged, leaving only the superstructure of the wheelhouse above the surface.[10] The parties disagree on how to classify this incident. Plaintiff maintains that the Vessel sank, while Defendant argues that the boat was swamped. Following the incident, the Vessel's owner removed it from the water and refurbished it.

Halifax never disclosed this incident during the insurance application process, despite its knowledge of the incident and St. Croix's personal acquaintance with the Vessel's prior owner. St. Paul asserts that this disclosure would have drastically altered its assessment of the risk associated with covering the Vessel. Further, Sterling maintains that St. Paul would have been unlikely to issue the policy had this disclosure been made during the application process. According to Sterling, even a partial submersion raises serious issues related to saltwater exposure, damage to electrical equipment, and pressure on the hull and keel that results from a boat resting on the harbor floor.

St. Paul also asserts that Halifax misrepresented the extent of the Vessel's 2003

---

5. St. Paul issued Marine Hull and Protection Indemnity Policy No. 0369–FA–1574.

6. St. Paul Material Facts, Ex. 2, St. Croix Dep. 65:1, July 17, 2006.

7. *Id.* 60:21–61:2; Def.'s Exs., Ex. 13, Keding Dep. 11:17, June 12, 2006.

8. Gunnels are the upper edge of the side of a vessel.

9. Def.'s Exs. Ex. 13, Keding Dep. 11:11–12.

10. *Id.* 10:7–8.

bottom side refastening, and notes a disparity between the extent of the work indicated in the Survey Report and the amount of services for which the D.N. Kelley shipyard billed. St. Paul alleges that the D.N. Kelley Shipyard invoices bear no indication of a complete refastening in 2003. A representative of the D.N. Kelley shipyard avers that any statement that D.N. Kelley or its subcontractors completely refastened the entire bottom of the Vessel in 2003 is "not correct." [11]

In 2003, the Vessel's bow, stern and starboard side were refastened.[12] The port side was completely replaced and refastened in 2001.[13] MSC concedes that its statement in the Survey Report that the Vessel's bottom had been entirely refastened in 2003, "should have been worded differently ..." [14] But MSC notes that the intent of the statement in the Survey Report was that "[o]ver the last several years the entire bottom had been refastened as found necessary during various haul outs and repair functions." [15] This is consistent with Halifax's position that the port side of the Vessel did not need repairs in 2003 because it had been fully replaced in 2001. Further, Halifax notes that it is was unaware that the Survey Report prepared by MSC was potentially inaccurate because the prior owner of the boat had told St. Croix that "they refastened the whole boat." [16]

On February 2, 2005, St. Paul sent Halifax a "reservation of rights" notice. This letter advised Halifax that issues had arisen during St. Paul's investigation of Halifax's claim and that these issues could result in St. Paul refusing to pay some or all of the claim.

In April of 2005, St. Paul brought the present action for declaratory judgment, asking this court to rescind the underlying insurance policy and absolve St. Paul of any liability. St. Paul and MGA now move for summary judgment.

## II. Discussion

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment in their favor as a matter of law.[17] " '[G]enuine' means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which 'might affect the outcome of the suit under the governing law.' " [18] In assessing whether the moving party has met its burden, the court "must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." [19] In reviewing the motion, this court will not credit or rely upon "conclusory allegations, improbable inferences and unsupported speculation." [20]

11. St. Paul Material Facts, Ex. 3, Kelley Dep. 30:15–18, Dec. 5, 2005.

12. Halifax Material Facts, p. 11; Def.'s Exs., Ex. 13, Keding Dep. 29:20–30:1, 43:20–24.

13. Halifax Material Facts, p. 11; Def.'s Exs., Ex. 13, Keding Dep. 29:20–30:40.

14. Def.'s Exs., Ex. 15, DuBois Letter, p. 2.

15. *Id.* p. 3.

16. Def.'s Exs., Ex. 10, St. Croix Dep. 38:8.

17. Fed.R.Civ.P. 56(c); *Mulloy v. Acushnet Co.*, 460 F.3d 141, 145 (1st Cir.2006).

18. *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218–19 (1st Cir.2004) (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 90 (1st Cir.1993)).

19. *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995).

20. *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

## A. Applicable Law

This case comes before this court under the umbrella of admiralty jurisdiction, since it involves a marine insurance policy.[21] Though the rules of admiralty law supersede local authority, federal courts of all levels, including the Supreme Court, have acknowledged a gray area with respect to maritime risk policies.[22] In *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, the Supreme Court charted a course away from explicit application of admiralty law for maritime insurance contracts. The Court noted that, "[t]he vast amount of insurance litigation in state courts throughout our history also bears witness that until recently state legislatures and state courts have treated marine insurance as controlled by state law to the same extent as all other insurance." [23]

■ But *Wilburn Boat* does not reach so far as to render the application of maritime law obsolete in the context of insurance disputes. In cases involving marine insurance contracts, this court will apply state law, unless an established maritime rule controls the issue *and* the rule materially differs from state law.[24]

■ The maritime doctrine of *uberrimae fidei* imposes on the prospective insured a duty to render information in the "utmost good faith." [25] Under this doctrine, the individual seeking insurance coverage is required to provide the carrier with "all known circumstances that materially affect the insurer's risk, the default of which ... renders the insurance contract voidable by the insurer." [26] This duty to disclose material facts applies even where no inquiry has been made.[27] And the obligation to disclose is independent of intent and is violated even where no intent to deceive is present.[28]

The doctrine of *uberrimae fidei* traces its roots to Great Britain and the evolution of risk insurance in the business of overseas trade.[29] British courts first acknowledged the duty of utmost good faith more than two centuries ago in a decision by Lord Mansfield, which highlighted the speculative nature of insurance coverage and the right of an underwriter to trust in the full disclosure of prospective clients.[30]

21. *See Commercial Union Ins. Co. v. Pesante,* 459 F.3d 34, 37 (1st Cir.2006).

22. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 313, 75 S.Ct. 368, 99 L.Ed. 337, (1955) ("Since the insurance policy here sued on is a maritime contract the Admiralty Clause of the Constitution brings it within federal jurisdiction. But it does not follow, as courts below *seemed to* think, that every term in every maritime contract can only be controlled by some federally defined admiralty rule. In the field of maritime contracts ... the National Government has left much regulatory power in the States." (footnotes and citations omitted)).

23. *Id.* at 317, 75 S.Ct. 368.

24. *Pesante,* 459 F.3d at 37.

25. *Id.*

26. *Id.* at 38 (quoting *Windsor Mt. Joy Mut. Ins. Co. v. Giragosian,* 57 F.3d 50, 54 (1st Cir.1995)).

27. *Grande v. St. Paul Fire & Marine Ins. Co.,* 436 F.3d 277, 283 (1st Cir.2006).

28. *Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.,* 944 F.Supp. 986, 993 (D.Mass.1996) (quoting *Sun Mutual Ins. Co. v. Ocean Ins. Co.,* 107 U.S. 485, 510, 1 S.Ct. 582, 27 L.Ed. 337 (1883)).

29. See Paula Hamilton Lee, Comment, *Untying The Gordian Knot And Opening Pandora's Box: The Need For A Uniform Maritime Rule Of Uberrimae Fidei With Respect To Marine Insurance,* 19 Tul. Mar. L.J. 411, 412 (1995).

30. *Id.* (citing *Carter v. Boehm,* 97 Eng. Rep. 1162, 1164 (K.B.1766)).

As a consequence of Mansfield's opinion and the subsequent codification of its central holding, the doctrine and duty of *uberrimae fidei* precluded either party from concealing private, relevant information to entice the other into a contract of insurance.[31]

The doctrine derives from the belief that in an insurance relationship, the insured is in a superior position compared to the insurer to know the risks associated with an insurance contract and, thus, should be required to disclose those risks to the insurer.[32] This policy made particular sense in the area of marine insurance, where insured vessels were often at sea or in foreign ports, and could not be easily inspected.[33]

The Supreme Court first recognized *uberrimae fidei* in the 19th century, notably referencing the duty of utmost good faith as "enlightened moral policy" in the 1828 case of *McLanahan v. Universal Insurance Co.*[34] Future decisions recognized the doctrine as a facet of American admiralty law and established the underlying duty as a component of a commercial practice rooted in mutual trust.[35]

Although the First Circuit has not yet issued an authoritative stance on whether *uberrimae fidei* is an established rule of maritime law,[36] the number and ratio of courts endorsing the doctrine weigh in favor of this conclusion. In the lion's share of federal cases, where the issue of nondisclosure is raised by an insurer seeking to vitiate a policy of maritime coverage, the traditional rule of *uberrimae fidei* has been applied.[37]

While it is true that some federal decisions, including that of the Fifth Circuit in *Albany Ins. Co. v. Anh Thi Kieu*, question the universal application of *uberrimae fidei*, it is equally important to note that the Fifth Circuit qualified its decision, acknowledging the continued relevance of

31. *Id.*

32. *Compagnie de Reassurance*, 944 F.Supp. at 993.

33. *Id.*

34. Lee, *supra* note 19, at 413 (quoting *McLanahan v. Universal Ins. Co.*, 26 U.S. 170, 185, 1 Pet. 170, 7 L.Ed. 98 (1828)).

35. See *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 409 F.2d 974, 981 (5th Cir.1969) (" 'It has been said that the insured is bound to communicate every material fact within his knowledge not known, or presumed to be known to the underwriter, whether inquired for or not, and that a failure in either particular, although it may arise from mistake, accident, of forgetfulness, is attended with the rigorous consequences that the policy never attaches, and is void ....' " (quoting *Fireman's Fund Ins. Co. v. Wilburn Boat*, 300 F.2d 631, 646 (1962)).

36. See *Pesante*, 459 F.3d at 38 ("While we have never actually decided the issue, it is true that we have questioned whether *uberrimae fidei* is an established rule of maritime law."); *Giragosian*, 57 F.3d at 54 ("We need not undertake this analysis [of whether to apply the doctrine of *uberrimae fidei* ], however, because we find that the stringent *uberrimae fidei* doctrine does not relieve Windsor of its liability to the Giragosians under the policy.").

37. *Commercial Union Ins. Co. v. Detyens Shipyard, Inc.*, 147 F.Supp.2d 413, 423 (D.S.C. 2001) ("The majority of courts faced with the application of *uberrimae fidei* to a marine insurance policy, have found that utmost good faith applies."); *Port Lynch, Inc. v. New England Intl. Assurety of Am., Inc.*, 754 F.Supp. 816, 821 (W.D.Wa.1991) ("In almost all the federal cases where the issue of misrepresentation or nondisclosure has been raised as a defense to coverage under a marine insurance policy, courts have applied the general rule of marine insurance, requiring full disclosure of all material facts by the insured and holding policies void *ab initio* where the insured fails to comply with this duty.").

the doctrine.[38] The Fifth Circuit's unwillingness to apply *uberrimae fidei* does not reflect the majority view of the doctrine within the circuit courts. To the contrary, *uberrimae fidei* is well settled in the Eleventh Circuit as a "clear rule of maritime law."[39] The Second Circuit also acknowledges the entrenchment of *uberrimae fidei*, suggesting that when, "evaluating whether particular facts are material, we must turn to the substantive law governing marine insurance. It is well established under the doctrine of *uberrimae fidei* that parties must accord each other the highest degree of good faith."[40]

█ Considering the predominant acceptance of this doctrine by federal courts across the country, this court concludes that the doctrine of *uberrimae fidei* is an established maritime rule.[41] The next question is whether this rule materially differs from state law.

Under the relevant Massachusetts statute, an insured's policy is void where his material misrepresentation or omission

was made with an intent to deceive, or where the misrepresentation increased the risk of loss.[42] St. Paul does not allege that Halifax acted with an intent to deceive, so under the applicable state law provision, the misrepresentation here is material if it increased the risk of loss.

But the court need not entertain an analysis of whether St. Croix's response of "No" on the Application was material under the increased risk of loss standard because, here, the court concludes that no misrepresentation occurred. Both the person answering the question, St. Croix, and the insurance representative who asked it, Duermyer, aver that they believed that the question on the Application referred to losses of the individual rather than losses of the boat. The question was ambiguous. And under Massachusetts law, where " 'there are two rational interpretations of policy language, the insured is entitled to the benefit of the one that is more favorable to it.' "[43]

**38.** 927 F.2d 882, 890 (5th Cir.1991) ("[W]hile we have found no cases in this Circuit which apply the doctrine, we also have found no cases which expressly reject the doctrine. Neither does this court hold that state insurance law always will supersede the *uberrimae fidei* doctrine. In an appropriate case, it is entirely possible that application of the doctrine would be more appropriate than application of the relevant state insurance regulations.").

**39.** *Steelmet Inc. v. Caribe Towing Corp.,* 747 F.2d 689, 695 (11th Cir.1984).

**40.** *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 13 (2d Cir.1986).

**41.** *See AGF Marine Aviation & Transp. v. Cassin,* No.2001–49, 2007 WL 309948 at *4 (D.Vi. Jan.22, 2007); *Chiariello v. ING Groep NV,* No. 04–1076, 2006 WL 516658 at *7 (N.D.Cal. Mar.2, 2006) (finding *uberrimae fidei* "well established federal law").

**42.** Mass. Gen. Laws. ch. 175 § 186 (2007) ("No oral or written misrepresentation or

warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss."). Risk of loss is measured by an objective standard, and is material if it would "naturally influence the judgment of [an] underwriter in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of the premium." *A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund,* 445 Mass. 502, 838 N.E.2d 1237, 1246 (2005) (quoting *Employers' Liab. Assur. Corp. v. Vella,* 366 Mass. 651, 321 N.E.2d 910, 913 (1975)).

**43.** *Trs. of Tufts University v. Commercial Union Ins. Co.* 415 Mass. 844, 616 N.E.2d 68, 72 (1993) (quoting *Hazen Paper Co. v. United States Fid. and Guar. Co.,* 407 Mass. 689, 555 N.E.2d 576, 583 (1990)); *See also Massachusetts Turnpike Auth. v. Perini Corp.,* 349 Mass. 448, 208 N.E.2d 807, 812 (1965) (noting that

St. Croix's response on the Application, therefore, does not qualify as a misrepresentation under Massachusetts law. This result differs materially from the established maritime rule of *ubberimae fidei*, which does not require a misrepresentation. Accordingly, the doctrine of *ubberimae fidei* applies.

■ St. Croix, as principal of Halifax, knew that in 2003, the Vessel submerged and sat on the bottom of Plymouth Harbor. That St. Croix never disclosed his prior knowledge of the 2003 incident during the application process is also undisputed.

■ Under the doctrine of *uberrimae fidei*, it does not matter whether Halifax omitted the information on the basis of neglect, ignorance or malice.[44] If the information is material, it must be disclosed. Though the notion of materiality is subjective by nature, it has been defined in these circumstances as "that which can possibly influence the mind of a prudent and intelligent insurer in determining whether it will accept the risk."[45] Whether something is material is an issue that is ordinarily left to the trier of fact, unless the outcome is "so clear that a reasonable jury could decide it only one way."[46]

Sterling, the Underwriting Manager for ocean marine insurance at Marine MGA, has particular experience underwriting marine risks related to commercial fishing vessels. Since 1978 he has underwritten tens of thousands of vessels, including thousands of wooden-hulled commercial fishing vessels.[47] Sterling avers that knowledge of the 2003 incident was material, and would have been grounds for denial of coverage, or at the very least, grounds for a more comprehensive survey and assessment of the Vessel. Sterling described the submersion as "highly relevant," and contends that parameters for his evaluation of risk would have been vastly different had he been aware of the 2003 incident.[48]

This court's function in resolving admiralty disputes does not render it an expert in the field of boat construction. Nevertheless, this court concludes that the potential harm from the 2003 incident leaves no room for dispute on the issue of materiality, as this is precisely the type of event that would possibly influence the mind of a prudent and intelligent insurer.[49] No reasonable juror would decide otherwise.

Defendant relies on *Windsor Mount Joy Ins. Co. v. Giragosian*, where a boat owner

---

uncertainties in an agreement are normally construed against the drafter).

44. *See Steelmet*, 747 F.2d at 695.

45. *Pesante*, 459 F.3d at 38; *Grande*, 436 F.3d at 282.

46. *Grande*, 436 F.3d at 283.

47. Def.'s Exs., Ex. 5, Decl. of John Sterling, ¶¶ 4–5.

48. *See Id.* ¶¶ 13–16, ("I learned that the Vessel had suffered a prior loss in 2003 when it sank at the dock in Plymouth, Massachusetts and sat on the bottom. I also subsequently learned that the amount of repairs done to the Vessel's bottom in 2003 was significantly less than what was represented in the Survey report ... These facts are highly relevant to the

risk I agreed to underwrite ... These were material facts that should have been disclosed to me and which would have significantly affected my decision to underwrite the Policy for the vessel. As a marine underwriter, I expected that these material facts would have been communicated to me when the insurance was applied for. Had I been made aware of the above facts, I would not have bound the insurance.").

49. *See Certain Underwriters at Lloyd's v. Montford*, 52 F.3d 219, 222–23 (9th Cir.1995) (finding that a maritime insurance applicant's loss history, the age of the vessel and its purchase price are all material facts). *All Underwriters at Lloyd's v. Kenney*, 986 F.Supp. 1384, 1385–86 (S.D.Fla.1997) (voiding maritime insurance policy where applicant failed to disclose the loss of another vessel). *Cf. AXA Global*

did not report that his boat had taken on water at its mooring, prior to a serious incident during which the boat sank in transit.[50] In that case, the First Circuit noted that "we do not think that the doctrine of *uberrimae fidei* requires boat owners to hire mechanics, at the risk of losing their insurance coverage, every time a boat takes on a small amount of water. As any boat owner knows, most boats leak at some time." [51]

But there is a marked factual contrast between *Giragosian* and the present case as to the seriousness of the incident and the insured's duty to report it. Here, the vessel did not merely take on a moderate amount of water. Rather, it took on so much water that it lost its capacity to remain buoyant and so sat on the harbor floor for days, with only the wheelhouse still above the waterline. This exposed the engine and electrical equipment to saltwater and put pressure on the hull and keel of the Vessel. This was material information that Halifax had a duty to disclose. Because this material fact was not disclosed, under the doctrine of *uberrimae fidei*, the insurance policy is void *ab initio*.[52]

Halifax argues that it did not need to inform St. Paul about the 2003 incident because knowledge of the incident was open and notorious. To support this claim, Halifax notes that a Google search of "Nicole II + sink" reveals a number of articles about the 2003 incident, and that the story received coverage on television news, as well as in local and city newspapers.[53] Halifax also notes that it is requesting footage of the incident recorded by a Channel 4 news helicopter.[54] This argument is self-defeating. That the incident received widespread media coverage and that an internet query about the vessel sinking in Plymouth Harbor yields articles further supports the conclusion that the incident was in fact material. And since the 2003 incident was material, the doctrine of *ubberimae fidei* requires its disclosure, regardless of whether knowledge of this information was open and notorious.[55]

Halifax notes that St. Paul has not produced a forensic expert's analysis of the

*Risks (UK) Ltd. v. Pierre,* No. 00–388, 2001 WL 1825853, at *9 (S.D.Fla. Nov.8, 2001) (finding issue of materiality of interior water damage from a hurricane and theft of fishing gear, without additional supporting evidence, were questions for a jury).

50.  *See* 57 F.3d 50.

51.  *Id.* at 55; *See also Reliance Nat'l Ins. Co. v. Hanover,* 222 F.Supp.2d 110, 116 (D.Mass. 2002) ("Whatever the exact extent of the applicability of the strict *uberrimae fidei* standard, we cannot believe that in these times it requires a pleasure boat owner to notify the insurer every time the craft takes on a small amount of water, or has engine trouble, at pain of losing coverage.").

52.  *See Reliance Nat'l Ins. Co. v. Hanover,* 246 F.Supp.2d 126, 136 (D.Mass.2003) (" 'The assured's failure to meet this standard entitles the underwriter to void the policy *ab initio.*' ") (quoting *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 13 (2d Cir.1986)).

53.  Halifax Material Facts ¶ 9; Def.'s Exs., Ex. 21.

54.  Halifax Material Facts ¶ 9.

55.  Defendant cites *Anh Thi Kieu* for the proposition that facts which the insurer has the opportunity to easily discover need not be disclosed. Def.'s Mem of Law in Opp. to St Paul's Mot. for Summ. J. 10. That case is easily distinguishable. In *Anh Thi Kieu,* the court did not apply *ubberimae fidei,* but instead applied Texas state insurance law, which holds that a misrepresentation by the insured does not invalidate an insurance policy unless the underwriter could not discover the misrepresentation with due diligence. 927 F.2d at 890 n. 7. Although this may be the case under Texas law, Defendant offers no modern case law to support the proposition that a similar exception exists to the high

wreckage, or an engineering expert to establish that the integrity of the hull would have been affected by the 2003 incident. Although an expert's testimony would be helpful, the court accepts the testimony of Sterling as sufficient. This is consistent with the First Circuit's opinion in *Pesante*, where the court credited the uncontroverted testimony of an insurance underwriter that the insured's failure to disclose that a boat was used for gill-netting rather than lobstering would have resulted in higher insurance premiums.[56] Here, Sterling avers that the 2003 incident was material, and significantly affected his decision to underwrite the Vessel. Halifax counters that the former owner of the boat made extensive repairs to the Vessel after the incident. But Halifax does not offer the testimony of any expert or insurance underwriter to rebut the statements of Sterling that the prior incident would influence a reasonable underwriter's judgment.

Halifax's failure to disclose the 2003 incident violated the doctrine of *ubberimae fidei*. Because Plaintiff has won on that ground, the court declines to determine whether Plaintiff has sufficiently proved

that the statement in the Survey Report regarding the refastening of the Vessel's hull also constitutes a material misrepresentation which increased the risk of loss, or whether it also violated the doctrine of *ubberimae fidei*.[57] The court also chooses not to address St. Paul's additional arguments in support of its motion that the sinking was not due to a named peril, and that Defendant did not maintain the Vessel in seaworthy condition.

## III.  Conclusion

In evaluating Halifax's failure to disclose the Vessel's 2003 incident in Plymouth Harbor, this court concludes that even drawing all reasonable inferences in Halifax's favor, it did not meet the standard of utmost good faith imposed by the doctrine of *uberrimae fidei*. As a consequence, St. Paul and MGA's *Motion for Summary Judgment* is ALLOWED. The insurance policy is void *ab initio* and does not provide coverage for the loss of the Vessel.

AN ORDER WILL ISSUE.

duties imposed on the insured by *ubberimae fidei*.

56.  *Pesante*, 459 F.3d at 38. In *Pesante*, the insured conceded that the misrepresentation was material. Here, Halifax does not.

57.  The court does note that the Appeals Court of Massachusetts has upheld summary judgment in favor of an automobile insurance company where the trial court found that the uncontroverted affidavits of the insurance underwriter sufficiently proved that the insured's misrepresentation increased the risk of loss and that the misrepresentation would have raised insurance premiums $119. *See Hanover Ins. Co. v. Leeds*, 42 Mass.App.Ct. 54, 674 N.E.2d 1091, 1095–96 (1997). Here, Sterling avers that the extent of the refastening was misrepresented and that it generally increased the risk of loss, but he does not specify the extent of the increased risk. Also,

Defendant does not concede that a misrepresentation occurred, or that it was material.

The court also notes that without additional information, the summary judgment record does not support the application of the doctrine of *ubberimae fidei* to misrepresentations or omissions concerning the refastening of the Vessel's hull. That doctrine applies to all *known* circumstances that materially affect risk. *See Pesante*, 459 F.3d at 37. Here, the summary judgment record does not include any affidavits or other discovery material which establish that St. Croix knew that the Survey Report was inaccurate when it was submitted with his Application. Without additional information about St. Croix's knowledge of the actual extent of the refastening, the court is unable to conclude that no genuine dispute exists regarding the factual proposition that Defendant had the requisite knowledge.